Andrew BYARS, Plaintiff-Appellant,

v.

BLUFF CITY NEWS COMPANY, INCORPORATED, Defendant-Appellee.

No. 77–1227.

United States Court of Appeals, Sixth Circuit.

Argued Nov. 30, 1978.

Decided Oct. 16, 1979.

As Amended on Denial of Rehearing Jan. 9, 1980.

Martin W. Brown, Cobb, Edwards, Hamlet, Nichol & Woodall, Michael C. Williams, Memphis, Tenn., for plaintiff-appellant.

Stephen H. Biller, Memphis, Tenn., Sam M. Phelps, Tuscaloosa, Ala., for defendant-appellee.

Before KEITH and MERRITT, Circuit Judges, and GREEN,* Senior District Judge.

KEITH, Circuit Judge.

This case presents intriguing questions of single firm monopoly power under section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.[1] The principle issue presented is one of the most unsettled and vexatious in the antitrust field: under what circumstances does a monopolist have a duty to deal?[2]

The plaintiff, Andrew Byars (Byars), had a long-standing business relationship with the defendant, Bluff City News Co. (Bluff City).[3] Bluff City changed ownership in 1970 and ended all of its business dealings with Byars. The plaintiff then brought this action, alleging that Bluff City was a monopolist which violated the Sherman Anti-Trust Act when it refused to do business with him. In addition, plaintiff added pendant claims of common-law unfair competition, based on an alleged campaign of "dirty tricks" waged against him by Bluff City. After a bench trial, the district court found for the defendant in all respects. Plaintiff appeals. Because we feel that additional fact-finding is needed, we remand for further proceedings.

## FACTS

### Background

Printed materials are published by various publishers in the United States and distributed through approximately 15 national distributors to regional wholesale distributors who, in turn, distribute the periodicals to retail outlets such as newsstands and convenience stores for resale to the general public.

Bluff City is one of a number of regional distributors of periodicals in the United States. For over thirty years, it has been a wholesale distributor of paperback books, magazines, and other periodicals to retail outlets in the Memphis-Shelby County, Tennessee, metropolitan area. As a regional wholesaler, Bluff City thus occupied a middle rung in the distribution chain. Following general industry practice, Bluff City's employees would regularly deliver magazines to the various retail outlets and pick up any unsold magazines for credit.[4]

---

* The Honorable Ben C. Green, Senior District Judge for the Northern District of Ohio, sitting by designation.

1. 15 U.S.C. § 2 makes it unlawful for a person to "monopolize, or attempt to monopolize, or combine with any other person or persons, to monopolize any part of the trade or commerce among the several states, or with foreign nations . . ." § 4 of the Clayton Act, 15 U.S.C. § 15, allows private parties to bring civil suits against violators of the Sherman Act.

2. For scholarly commentary on this question, see 3 P. Areeda & D. Turner, Antitrust Law ¶¶ 723–736 (1978); 10 Von Kalinowski Anti-Trust Laws and Trade Regulation § 61.01–03 (Rev. Ed. 1979); Sullivan, Antitrust § 48 (1976); Note, *Refusals to Deal by Vertically Integrated Monopolists*, 87 Harv.L.Rev. 1720 (1974); Cooper, *Attempts and Monopolization: A Mildly Expansionary Answer to the Prophylactic Riddle of Section Two*, 72 Mich.L.Rev. 373, 440–445 (1974); Buxbaum, *Boycotts and Restrictive Marketing Arrangements*, 64 Mich.L.Rev. 671, 678–80 (1966); Fulda, *Individual Refusal to Deal: When Does Single-Firm Conduct Become Vertical Restraint?* 30 Law & Contemp. Prob. 590 (1965); Barber, *Refusals to Deal Under the Federal Anti-Trust Laws*, 103 U.Pa.L.Rev. 847 (1955); Report of the Attorney General's Nat'l Comm. to Study the Antitrust Laws 132–37 (1955).

3. Bluff City was a proprietorship owned by Mr. S. I. Bernbaum until 1970 when the business was sold to Mr. Guy Momam and family. At the time of sale, the company was incorporated and remains so to this day. We shall at all times refer to the company as Bluff City, both pre and post incorporation.

4. As is indicated below, allowing credit for unsold magazines is critical to the industry. Since periodicals go out of date quickly, no retailer would accept more than a minimal number of periodicals for resale if he bore the risk of loss. Accordingly, it is industry practice for regional wholesalers to accept unsold periodicals for credit from retailers so long as returns are made within a certain time period. Similarly, the national distributors accept unsold magazines for credit from the regional wholesalers. It is not clear from the record whether the ultimate loss for unsold magazines is borne by the national distributors or by the publishing companies themselves. Of course, to the extent that the national distributors are owned by the publishing companies, the question is academic.

Early in 1957, Mr. S. I. Bernbaum, Bluff City's owner at that time, determined that a number of small outlets did not sell enough magazines to justify the cost of the regular pick up and deliveries by Bluff City's employees. Desirous of not losing their business altogether, Mr. Bernbaum arranged to have Mr. Howard Troyer service these small outlets. Pursuant to the new arrangement, Troyer would buy periodicals from Bluff City at ten per cent less than wholesale price and sell them to small retail outlets which Bernbaum preferred not to service in the regular manner.

Troyer was a friend and co-worker of the plaintiff, Andrew Byars. Later in 1957, Troyer suggested that Byars join him in distributing magazines to the small retail outlets. A year later, Byars and Troyer separated their operations geographically. Troyer would buy periodicals at ten per cent less than wholesale and sell them to small retail outlets in a certain area of the Memphis-Shelby County region; Byars would do the same for the remaining areas.

Byars and Troyer distributed periodicals part-time. Each had the right to solicit new customers, at least so long as they were small retail outlets which Bluff City would not care to service. In 1967, Troyer, desirous of giving up his part-time distribution of periodicals, sold his accounts to Byars. From then on, Andrew Byars was the only person handling the small accounts.

Byars worked diligently. He would solicit additional accounts and make separate payment agreements with his customers. He billed the customers on invoices marked "Andrew Byars News." He drove a truck with this label on the side, and employed various people to help him on a part-time basis. By 1970 the plaintiff was serving approximately 150 retail outlets and had a gross sales volume of almost $350,000.00.

■ The parties have entered into a heated dispute on the issue of whether Byars was an employee of Bluff City. Plaintiff himself characterized his position as that of a "rack jobber." The district court stated that Byars was an employee in the "common law sense" because he was subject to some degree of control by Bluff City. Our review of the record persuades us that Byars' relationship with Bluff City is a classic example of that of an independent contractor—that is, someone who is paid to complete a job, but whose day-to-day activities are not subject to control by the employer.[5]

Unlike Bluff City's regular employees, Byars was not paid a salary. Instead, Byars would turn over to Bluff City all of the money which he had collected from the retail outlets he serviced and would receive a monthly check representing his commission on sales. His commission was set at ten percent, later increased to ten and one half percent.[6] Bluff City News was not aware of all of Byars' accounts, and did not directly supervise the manner in which he serviced them. If Bluff City received complaints from one of Byars' retail outlets, the complaint would be referred directly to Byars himself. Similarly, Byars was furnished a federal tax form 1099 at the end of the year, while route salesmen who were Bluff City employees were furnished W–2 forms.[7] Further, the risk of loss from outdated returns or similar difficulties, was borne directly by Byars.[8] In contrast, Bluff

---

**5.** See 57 C.J.S. Master and Servant § 580 et seq.; 53 Am.Jur.2d, Master and Servant § 4 et seq.; 41 Am.Jur.2d, Independent Contractors § 5 et seq. See also 26 U.S.C. § 3121; 26 C.F.R. § 31.3121(d)–1 (1978).

**6.** This was apparently done voluntarily, as a goodwill gesture reflective of then-existing harmonious relations between Byars and Bluff City.

**7.** Compare 26 U.S.C. §§ 1401–02 with 26 U.S.C. §§ 3101–02.

**8.** As indicated in n. 4, supra, there exists a general return privilege in the industry for unsold periodicals. However, sometimes retailers would not return unsold periodicals within allotted time periods. As a matter of goodwill, the wholesale supplier would accept these late returns for credit and bear the loss itself.

City's employees were not held responsible for similar losses incurred on their routes.[9]

The relationship between Byars and Bluff City operated smoothly for many years. In 1970, however, the fortunes of the business world upset the harmony of the *status quo.* In May of 1970, Bluff City's owners, S. I. Bernbaum and family, sold the business to Mr. Guy Moman and family.[10] The national distributors from whom Bluff City received its publications were informed of the sale; they continued to do business with Bluff City's new owners. From June 1, 1970, until December 31, 1970, Bluff City's new owners permitted the plaintiff to continue to operate in the same manner which he had previously.

By the end of 1970, the new owners had become unhappy with the arrangement with Byars. Testimony credited by the district court revealed that, as a matter of business preference, the new owners did not want to continue the independent contractor relationship with Byars. Instead, the new owners wanted to revert to the pre-1957 manner of operation in which they directly serviced Byars' small customers themselves.

There is no dispute that a series of meetings took place between Byars and the new owners. There is considerable dispute as to what took place at these meetings. The district court credited testimony that the new owners gave Byars several months in which to convince them that the arrangement should continue. Unconvinced that Byars' route fit in with their way of doing business, Bluff City's new owners decided to terminate the arrangement. Mr. Moman testified, and the district court found, that he determined to terminate the independent "rack jobber" arrangement with Byars and instead to pay Byars a salary, employing him directly in a supervisory position. According to Moman, this arrangement was not acceptable to Byars.[11]

Whatever the dispute as to the circumstances leading up to Bluff City's termination of its arrangement with Byars, there is no dispute that as of January 1, 1971, Bluff City did terminate the arrangement and refused to deal with him. It then took over and serviced Byars' former accounts itself.[12]

## The Industry

The wholesale publication distribution industry recognizes two separate markets for periodicals. The "primary line" periodicals are those which are generally acceptable to the general public. "Primary line" periodicals are limited to those periodicals which are distributed by approximately 15 major national distributors. This classification does not include periodicals categorized by the industry as "secondary line periodicals"; that is, periodicals which are not as acceptable to the general public. Although the distinction between primary and secondary line periodicals is not entirely clear, it appears that the secondary periodicals are those periodicals which are of special interest to a limited public. Thus, highly specialized and/or sexually-oriented periodicals are regarded as being within the secondary

9. Still, as in most such relationships, there is some indication that plaintiff was regarded as an employee of Bluff City. The plaintiff qualified for and received prizes and bonuses awarded from time-to-time by Bluff City to its regular route men. Similarly he also received Christmas certificates and participated in Bluff City's group insurance plans. Bluff City insured plaintiff's inventory and provided free warehouse space where he picked up the magazines. The plaintiff appeared on Bluff City's roster of employees. On balance, however, it is clear that both Byars and Bluff City recognized that Byars was different from a regular employee and that he had considerable discretion in the servicing of his own accounts which Bluff City's regular employees did not.

10. *See* n. 3, *supra.*

11. For cases presenting factually similar situations, *see Knutson v. Daily Review Inc.,* 548 F.2d 795 (9th Cir. 1976), *cert. denied,* 433 U.S. 910, 97 S.Ct. 2977, 53 L.Ed.2d 1094 (1977); *McGuire v. Times Mirror Co.,* 405 F.Supp. 57 (C.D.Cal.1975); *Millcarek v. Miami Herald Publishing Co.,* 388 F.Supp. 1002 (S.D.Fla. 1975).

12. It is undisputed that Mr. Moman did not employ limited service independent salesmen in any of his other wholesale distribution agencies in Alabama and Mississippi. Thus it appears that in terminating Byars, Bluff City's new owners acted in accordance with their general approach to conducting their business.

line. All agree that the dispute in this case centers around the distribution of primary line periodicals in the Memphis and Shelby County, Tennessee area.

After January 1, 1971, plaintiff was unable to acquire any primary line periodicals for resale. He attempted to obtain such periodicals at wholesale prices from the national distributors who supplied these periodicals to Bluff City. In each instance, he was turned down. Cut off from his former source of supply and unable to locate a new one, plaintiff was unable to sell primary line periodicals to his customers. He struggled along, and was able to stay in business for several years by selling secondary line periodicals which he obtained from other distributors. Throughout this period, Byars tried continuously to obtain primary line periodicals from other sources and requested that Bluff City sell to him, but such requests were refused.

Beginning in October, 1973, Byars was finally able to obtain primary line periodicals from sources outside of normal distribution channels. This source of supply is subject to termination without notice, as was Byars' arrangement with Bluff City News. Although this new source of supply has enabled Byars to compete somewhat with Bluff City in the sale of primary line periodicals, there was testimony that the source of supply is limited. As a result, Byars has been unable to fully compete with the defendant since he cannot expand the number of stores which he services.

In the ordinary case, this tale would elicit much sympathy but no legal redress. Thorny legal issues are presented, however, because of Bluff City's alleged status as a monopolist and because of the alleged "dirty tricks" it played on Byars when he

tried to stay in business after the parties' relationship terminated.

## I. The Relevant Market

In a typical section 2 monopolization or attempt to monopolize case, the issues of relevant product market and relevant geographic market are usually hotly contested.[13] In this case, however, there is no dispute whatsoever as to these issues. The parties have stipulated that the relevant product market is over-the-counter sale of "primary line" periodicals.[14] The parties have also stipulated that the relevant geographic market encompasses the area around Memphis where Bluff City distributes periodicals—that is Memphis and Shelby County, Tennessee; Southhaven, Mississippi; and West Memphis, Arkansas. The question which this case presents, then, is whether Bluff City's refusal to deal with Byars constituted illegal monopolization within the stipulated market.

## II. Monopolization in Violation of Section 2 of the Sherman Act

In *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966), the Supreme Court noted that illegal monopolization under Section 2 of the Sherman Act has two distinct elements: 1) possession of monopoly power in the relevant market and 2) "the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Id.*[15]

### A. Possession of Monopoly Power

The Supreme Court has defined monopoly power as "the power to control prices or exclude competition." *United States v. Grinnell*, 384 U.S. 563, 571, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966); *United States*

---

13. *See e. g. United States v. Grinnell Corp.*, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); *United States v. E. I. DuPont DeNemours and Co.*, 351 U.S. 377, 81 S.Ct. 1243, 6 L.Ed.2d 318 (1956); *Telex Corp. v. I.B.M.*, 510 F.2d 894 (10th Cir.), *cert. dismissed*, 423 U.S. 802, 96 S.Ct. 8, 46 L.Ed.2d 244 (1975).

14. This market excludes "primary line" periodicals distributed through direct readers' sub-

scriptions and excludes all sales of "secondary line" periodicals.

15. For an excellent discussion of § 2 of the Sherman Act, see Judge Kaufman's opinion in *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir. 1979). We, of course, express no opinion on whether we agree with the *Berkey* court's application of the law to the facts of that case.

*v. DuPont and Co.,* 351 U.S. 377, 391, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). ". . . [T]he material consideration in determining whether a monopoly exists, is not that prices are raised and that competition is excluded, but that power exists to raise prices or to exclude competition when it is desired to do so." *American Tobacco Company v. United States,* 147 F.2d 93, 112 (6th Cir. 1944) (McAllister, J.), *aff'd,* 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946).

As the Supreme Court noted in *American Tobacco Company v. United States,* 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946), the simplest way of showing monopoly power is to marshal evidence showing the exercise of actual control over prices or the actual exclusion of competitors. This was the approach taken in older cases. *See United States v. Int'l Harvester Co.,* 274 U.S. 693, 708, 47 S.Ct. 748, 71 L.Ed. 1302 (1927); *United States v. United States Steel Corporation,* 251 U.S. 417, 451, 40 S.Ct. 293, 64 L.Ed. 343 (1920). *See also United States v. Swift & Co.,* 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932).

In order to better deal with antitrust cases, courts developed what can best be described as a shortcut formula which en-

tails measuring the market share possessed by the alleged monopolist. The leading case taking this approach is *United States v. Aluminum Co. of America (Alcoa),* 148 F.2d 416, 424, 429 (2d Cir. 1945), where Judge Learned Hand saw no need for additional analysis when confronted with evidence of massive market control. He simply pointed to the fact that Alcoa possessed a 90 percent share of the relevant market and concluded that the company possessed monopoly power.[16] The Supreme Court expressly approved Judge Hand's views in *American Tobacco Co. v. United States,* 328 U.S. 781, 813–14, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946), and ever since market share has been the critical factor in § 2 antitrust cases.[17]

■ Although courts have been quick to find monopoly power where the market share is 75–80% or greater,[18] this should be regarded as a starting point. Thus, while "the existence of such [monopoly] power ordinarily may be inferred from the predominant share of the market" *United States v. Grinnell Corp.,* 384 U.S. 563, 571, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966), such an inference does not have to follow

---

16. In a famous dictum, Judge Hand stated that it was doubtful whether 60 or 64% of the market would be enough to constitute a monopoly and that 33% would certainly not be enough. *United States v. Aluminum Co. of America,* 148 F.2d 416, 424 (1945).

17. This is the reason why relevant market is so critical in antitrust cases. How one defines the relevant market determines market share and market share all but determines whether one is a monopolist. *See e. g. United States v. DuPont & Co.,* 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956) (Majority's broad definition of relevant market resulted in a finding that DuPont had 20% of that market and was therefore not a monopolist. The dissent would have defined the market more narrowly and inferred monopoly power from DuPont's 75% share of this market). *See also* Sullivan, Antitrust § 12 *et seq.*

18. *See United States v. Grinnell,* 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966) (87% of the market); *Int'l Boxing Club, Inc. v. United States,* 358 U.S. 242, 79 S.Ct. 245, 3 L.Ed.2d 270 (1959) (81% of championship fights); *American Tobacco Co. v. United States,* 328

U.S. 781, 66 S.Ct. 1125, 100 L.Ed.2d 1575 (1946) (80% of market constituted monopoly power); *Sunkist Growers, Inc. v. Winckler & Smith Citrus Prod. Co.,* 284 F.2d 1 (9th Cir. 1960), *rev'd on other grounds,* 370 U.S. 19, 82 S.Ct. 1130, 8 L.Ed.2d 305 (1962) (70% of market for by-product oranges); *Kansas City Star Co. v. United States,* 240 F.2d 643 (8th Cir.) *cert. denied,* 354 U.S. 923, 77 S.Ct. 1381, 1 L.Ed.2d 1438 (1957), (96% of narrowly defined market for communications media operations); *United States v. Besser Mfg. Co.,* 96 F.Supp. 304 (E.D.Mich.1951), *aff'd on the other grounds,* 343 U.S. 444, 72 S.Ct. 838, 96 L.Ed. 1063 (1952) (65% of market where balance divided between 50 small competitors); *United States v. Paramount Pictures, Inc.,* 85 F.Supp. 881 (S.D.N.Y.1949) (70% of market for first run theatres in 92 largest American cities). *See also United States v. DuPont & Co.,* 351 U.S. 377, 425, 76 S.Ct. 994, 1022, 100 L.Ed. 1264 (1956) (Warren, C. J. dissenting) ("Since DuPont has the lion's share of that market, it must have monopoly power, as the majority concede").

automatically.[19] Only a careful factual analysis of the market in question will reveal whether monopoly power, in fact, exists.[20]

Reverting to pre-*Alcoa* analysis, the district court did not attempt to measure Bluff City's market share. Thus, it did not address uncontroverted proof that measured both in terms of the number of outlets served and dollar volume of sales, Bluff City possesses approximately ninety percent (90%) of the relevant market.[21] This is hardly surprising since the only sources of wholesale primary-line periodicals in the Memphis area are the two litigants. And, since Byars was cut off by the defendant, he has struggled to get primary-line periodicals to resell to his customers. Indeed,

from January 1971 to October 1973, the plaintiff was unable to secure primary-line periodicals from any source and, as a result, Bluff City controlled virtually 100% of the relevant market.

The district court concluded that Bluff City did not have monopoly power. This determination was based on two facts. First, the court below emphasized that the relationship between Bluff City and the national periodical distributors was terminable at will. The court found that it was the economics of the industry which led the national distributors to deal exclusively with a single regional distributor such as Bluff City.[22] Periodicals are highly perishable; when they get out of date, they are worthless. Few retailers would sell maga-

19. See P. Areeda, Antitrust Analysis: Problems, Text, Cases. 18–20, 197–203 (2d ed. 1974); Note, *The Development of the Sherman Act Section 2 Market Share Test and Its Inapplicability to Dynamic Markets*, 49 So.Calif.L.Rev. 154, 182–186 (1975). These commentators have noted that two factors in particular could offset the inference of monopoly power which goes with possession of a high market share: 1) entry barriers and 2) temporal considerations. If entry barriers are low, the threat of potential competition operates as a significant check on monopoly power since competitors will quickly enter the market if prices are raised significantly. Similarly, possession of monopoly power may only indicate short-term success from innovation which will quickly dissipate as competitors catch up. A careful examination of the publishing industry might reveal other factors which could raise doubts whether the defendant possesses monopoly power.

One factor which deserves assessment is the conduct of the national distributors. It is clear that to the extent that Bluff City does have a monopoly in the relevant market, that monopoly exists at the pleasure of the national distributors. It may be that the national distributors carefully police the conduct of the regional distributor and are quick to withdraw an exclusive franchise at the first sign of consumer dissatisfaction. On the other hand, the national distributors may not care about the regional distributors' conduct so long as they make their profit.

20. See Pac. Coast Agr. Export Ass'n v. Sunkist Growers, Inc., 526 F.2d 1196 (9th Cir. 1975), cert. denied, 425 U.S. 959, 96 S.Ct. 1741, 48 L.Ed.2d 204 (1976) (defendant's share of the relevant distribution market ranged from 45–70%, but competitors were small and defendant had monopoly power over supply market);

*United States v. United Shoe Machinery Corp.*, 110 F.Supp. 295, 343 (D.Mass.1953), aff'd per curiam, 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910 (1954), (court gave "some weight" to 75 plus percent market share, but performed careful analysis of the shoe machinery industry to reach its conclusion that defendant possessed monopoly power). Cf. *United States v. General Dynamics Corp.*, 415 U.S. 486, 94 S.Ct. 1186, 39 L.Ed.2d 530 (1974) (Court did not discuss market share, but concluded from its analysis of the industry that no substantial lessening of competition would result from a merger challenged under § 7 of the Clayton Act).

21. At the time of trial, the defendant served 554 customers, the plaintiff served 59. Three other retail outlets received publications from other sources. Our examination of confidential dollar sales volume figures submitted under seal shows that between 1973 and 1975, Bluff City had from 94% to 96% of the relevant market measured in sales volume.

22. This case does not present any issues involving a violation of section 1 of the Sherman Act because of a joint refusal to deal, sometimes referred to as a group boycott. See e. g. *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); *William Goldman Theaters v. Loew's, Inc.*, 150 F.2d 738 (3d Cir. 1945), cert. denied, 334 U.S. 811, 68 S.Ct. 1016, 92 L.Ed. 1742 (1948). It is true that none of the primary line national periodical distributors would deal with plaintiff, despite his requests that they do so. Testimony in the record reveals that each distributor made an independent decision not to sell to plaintiff, and that no conspiracy or joint refusal to sell took place.

zines to the public if they bore the risk of loss for unsold out-of-date periodicals. Accordingly, industry practice is to allow unlimited return of unsold periodicals to the regional distributor and from the regional distributor back to the national distributors. Industry experience has shown that where there are two or more regional distributors competing with each other, confusion and high rates of return of unsold merchandise are the order of the day.[23] To minimize these problems, national distributors have made the independent[24] decision to deal with only one regional distributor whenever possible.

Secondly, the district court emphasized that since October of 1973, the plaintiff has been able to obtain periodicals from a distributor in another state at an even better discount than he formerly obtained from Bluff City. The court also pointed out that Byars has been doing business with Johnson Publications, a publisher and distributor of black oriented magazines since 1973.

■ We do not believe that the district court's analysis of Bluff City's market position suffices to support its conclusion that Bluff City did not possess the power to raise prices or exclude competition. Rather, this record fairly supports the conclusion that industry practice has resulted in a limited number of exclusive regional wholesalers. However, the fact that national periodical distributors have legitimately and individually chosen to deal only with Bluff City does not mean that Bluff City lacks monopoly power in the relevant market. On the contrary, it appears that the national distributors have conferred a monopoly upon Bluff City. That there may have been valid business reasons for this cannot disguise Bluff City's market dominance.

The other factors cited by the district court are also flawed. The court did not address evidence that Byars' source of primary line periodicals at the time of trial was limited and that he has been unable to expand his business as a result. The court further failed to address proof that from January 1971 to October 1973, Byars was unable to secure primary line periodicals from any source, and that as a result, Bluff City controlled virtually 100% of the relevant market during that time. Finally, it appears that the "black-oriented" periodicals supplied by the Johnson Distributing Company are not primary line periodicals but secondary line periodicals which are not within the relevant product market in this case.[25]

■ We think that fresh fact-finding on this issue is in order. The district court should first consider Bluff City's market share. As indicated, it appears to be at least 90 percent. It may well be, that despite this, Bluff City does not possess mo-

---

**23.** Although we accept this finding, we note that it may not be true under all circumstances. If two distributors both supply the same magazines to a retail store, then there will be an increase in unsold magazines and confusion as to which distributor's magazines were sold. If two distributors compete among themselves as to which retail stores to service, these adverse effects do not necessarily follow so long as only one distributor ends up supplying each store.

**24.** The decision made by the national distributors is similar to that made by national film companies to only allow distributors with a full line of products to market posters and other movie display accessories. The Third Circuit upheld this decision because it was independently made for valid business reasons. *See Lawlor v. National Screen Service Co.*, 270 F.2d 146 (3d Cir. 1959), *cert. denied*, 362 U.S. 922, 80 S.Ct. 676, 4 L.Ed.2d 742 (1960).

In another analogous case, the Second Circuit upheld the right of publishing companies to cease doing business with a regional distributor with whom they were dissatisfied and to replace it with a system of 13 smaller regional distributors. Each company acted independently and for a valid business reason. *See Interborough News Co. v. The Curtis Publishing Co.*, 225 F.2d 289 (2d Cir. 1955) *aff'ing* 127 F.Supp. 286 (S.D.N.Y.1954).

**25.** In its brief and in a post-argument supplemental letter, Bluff City argued that there were other wholesalers active in the area. However, there is no finding below to this effect and other wholesalers appear to serve only 3 stores in the stipulated geographic market. The existence of potential competition of course, can check the exercise of monopoly power. *See* n. 19, *supra*. The parties are free to argue this issue on remand.

nopoly power. Only a careful factual analysis will reveal if this is so.[26]

### B. Abuse of Monopoly Power

■ If the court below does find that Bluff City possesses monopoly power, the record before us suggests that at worst, such power was thrust upon Bluff City by the national periodical distributors who, for valid business reasons, chose to deal only with it. This is significant because mere possession of monopoly power is not illegal. A monopolist which achieves that status because of "a superior product, business acumen, or historic accident," *United States v. Grinnell Corp., supra,* 384 U.S. at 571, 86 S.Ct. at 1704, cannot be faulted.[27] Such monopolists are "tolerated but not cherished" because of "considerations of fairness and the need to preserve proper economic incentives." *Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 274 (2d Cir. 1979). However, if a monopolist abuses its monopoly power and acts in an unrea-sonably exclusionary manner vis-a-vis rivals or potential rivals, then § 2 is violated. If, after the additional fact-finding ordered on remand, the district court finds that Bluff City did in fact possess monopoly power, it must then determine whether Bluff City abused this power by refusing to deal with Byars.

Plaintiff contends that Bluff City abused its monopoly power in two ways: First, by refusing to deal with him and second by engaging in a series of "dirty tricks" against him. The district court agreed that Bluff City had cut the plaintiff off and had refused to deal with him,[28] but ruled that it was perfectly within its rights in doing so. The court further concluded that prior to January 1, 1971, there existed no competition between the plaintiff and Bluff City. Rather, it found a dependent, but non-competitive relationship whereby the defendant serviced the small accounts which Bluff City did not desire. While this finding is fully supported by the evidence,[29] it is un-

---

**26.** Important to this determination will be an analysis of plaintiff's allegations of adverse effect upon the small retailers. There is evidence in the record, not addressed by the district court, that when Bluff City took over servicing Byars' former small retail customers, the result was inferior service at greater cost which the small retailers were forced to bear since they had nowhere else to turn for primary-line periodicals.

Byars' customers mostly operated neighborhood convenience stores. When Bluff City cut off Byars and took over his accounts, it imposed a service charge on them which Byars had not. In addition, Bluff City provided some of the stores only with drop shipment service, i. e., magazine bundles were simply dropped off. Byars always provided full service, i. e., he always placed the new magazines on the store racks. A number of the small store operators testified that Bluff City's services were very poor compared with Byars'. Specifically, Bluff City was slow in giving credit for returns and was sometimes overly rigid in demanding that retailers carry large numbers of unwanted titles. It appears that the retailers preferred Byars' eager-to-please personalized service to Bluff City's "assembly-line" approach. This evidence, if credited, lends strong support to plaintiff's contention that Bluff City possesses monopoly power.

**27.** The classic case is that of a "natural" monopoly such as that possessed by a utility company in a city. For example, in *Otter Tail*

*Power Co. v. United States,* 410 U.S. 366, 369, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973), the Court noted that "[e]ach town in Otter Tail's service area generally can accommodate only one distribution system, making each town a natural monopoly market for the distribution and sale of electric power at retail."

Other examples of a "natural" monopoly are the single newspaper in a small-town, *see Times Pickayune Publishing Company v. United States,* 345 U.S. 594, 602–603, 73 S.Ct. 872, 97 L.Ed. 1277 (1953); *Union Leader Corp. v. Newspapers of New England, Inc.,* 284 F.2d 582 (1st Cir. 1960), *cert. denied,* 365 U.S. 833, 81 S.Ct. 747, 5 L.Ed.2d 744 (1961); *United States v. Hartke-Hanks Newspapers, Inc.,* 170 F.Supp. 227 (N.D.Tex.1959), or the single movie in a small town, *see United States v. Griffith,* 334 U.S. 100, 106, 68 S.Ct. 941, 92 L.Ed. 1236 (1948); *John Wright & Assoc. v. Ullrich,* 328 F.2d 474 (8th Cir. 1964) which cannot support more than one of those entities. *See also Clark Marine Corp. v. Cagill, Inc.,* 226 F.Supp. 103 (E.D.La.1964), *aff'd* 345 F.2d 79 (5th Cir. 1965), *cert. denied,* 382 U.S. 1011, 86 S.Ct. 620, 15 L.Ed.2d 526 (1966).

**28.** Indeed, there is absolutely no dispute that this occurred.

**29.** To be sure, there is some evidence in the record which indicated that some stores were offered the choice of being served by Byars or by Bluff City. On the whole, however, Byars and Bluff City served distinct customer groups.

questionably true that after January 1, 1971, the plaintiff desired to and indeed, finally did, compete against Bluff City. Further, it is also uncontroverted that Bluff City has continued to refuse to deal with the plaintiff and that the plaintiff has had difficulty competing as a result.

The district court dealt only obliquely with the evidence in the record regarding Bluff City's predatory "dirty tricks" against the plaintiff.[30] It discussed this evidence at the end of its opinion, when dealing with a related claim of common-law unfair competition—not when dealing with the antitrust allegations. It specifically referred to testimony indicating that some of plaintiff's magazines had been removed from racks in retail outlets served by both plaintiff and defendant and to testimony of disparaging remarks made about plaintiff and his financial condition. The court concluded that "this testimony is controverted and upon cross examination of the witnesses the willfulness and unfairness was deflated." The court also stated that "the proof does not establish that these [sic] so-called unfair competition was done pursuant to instruction from or in furtherance of an adopted policy of the management of the defendant."

### III. Refusals to Deal

■ The district court appeared to take the broad view that a company has the unfettered right to deal with whom it pleases regardless of the circumstances. It is true that as a general rule, there exists no duty to deal, so long as the determination is made unilaterally. *See e. g. Associated Press v. United States,* 326 U.S. 1, 14–15, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945); *United States v. Colgate & Co.,* 250 U.S. 300, 307,

39 S.Ct. 465, 63 L.Ed. 992 (1919). In contrast, *concerted* refusals to deal are in many situations *per se* violative of section one of the Sherman Act. *See United States v. General Motors Corp.,* 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); *Klor's Inc. v. Broadway-Hale Stores,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); *McDonnell v. Michigan Chapter # 10 Am. Inst. of Real Estate Appraisers,* 587 F.2d 7 (6th Cir. 1978); *Oreck Corp. v. Whirlpool Corp.,* 579 F.2d 126 (2d Cir.) *cert. denied,* 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978); Sullivan, Antitrust § 83 *et seq.* (1976).

■ Franchisees and distributors which have been unilaterally terminated have discovered to their chagrin that ordinarily the law offers them no remedy absent proof that a conspiracy against them took place. *See e. g. Daniels v. All Steel Equipment, Inc.,* 590 F.2d 111 (5th Cir. 1979); *Fray Chevrolet Sales, Inc. v. General Motors Corp.,* 536 F.2d 683, 686 (6th Cir. 1976); *Burdett Sound, Inc. v. Attic Corporation,* 515 F.2d 1245 (5th Cir. 1975); *Elder-Beerman Stores Corp. v. Federated Dept. Stores, Inc.,* 459 F.2d 138 (6th Cir. 1972); *Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke and Liquors, Ltd.,* 416 F.2d 71 (9th Cir.), *cert. denied,* 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1969); *Ace Beer Distributors, Inc. v. Kohn, Inc.,* 318 F.2d 283 (6th Cir. 1963), *cert. denied,* 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 166 (1964); *Aaron E. Levine & Co., Inc. v. Calkraft Paper Co.,* 429 F.Supp. 1039, 1046–47 (E.D.Mich.1976); *B & B Oil & Chemical Co. v. Franklin Oil Corp.,* 293 F.Supp. 1313 (E.D.Mich.1968). *Cf. Daily Press, Inc. v. United Press Int'l,* 412 F.2d 126, 134–35 (6th Cir.), *cert. denied,* 396 U.S. 990, 90 S.Ct. 480, 24 L.Ed.2d 453

---

**30.** There was some testimony in the record which, if credited, could result in a finding of predatory conduct by Bluff City. These alleged activities included: 1) removal of plaintiff's periodicals from sales racks at various retail outlets; 2) covering up of plaintiff's periodicals on the racks to put them out of the view of prospective buyers; 3) below cost pricing of those few periodicals being distributed by the plaintiff; 4) disparagement of the plaintiff, his financial condition, and the periodicals he was able to obtain; 5) surreptitious addition of its own periodicals identical to those placed on racks by plaintiff in order to increase plaintiff's return and diminish plaintiff's profits; 6) intimidation of plaintiff's customers to purchase periodicals solely from defendant; 7) threats to the regional representative of an independent news company with reprisals if he assisted plaintiff in the direct purchase of periodicals from independents. *See generally Photovest Corp v. Fotomat Corp.,* 606 F.2d 704 (7th Cir. 1979); 3 Areeda & Turner, Antitrust Law ¶ 37 *et seq.* (1978).

(1969). An agreement with another distributor to replace the terminated distributor does not count as a conspiracy. *Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke and Liquor, Ltd., supra* at 78, *See also Packard Motor Car Co. v. Webster Motor Car Co.*, 100 U.S.App.D.C. 161, 163–164, 243 F.2d 418, 420–21 (D.C. Cir.) *cert. denied*, 355 U.S. 822, 78 S.Ct. 29, 2 L.Ed.2d 38 (1957). Even the use of unfair business practices as part of the termination may not invoke sanction under the antitrust laws. *See Northwest Power Products, Inc. v. Omark Ind. Inc.*, 576 F.2d 83 (5th Cir. 1978). *But see Industrial Bldg. Materials, Inc. v. Interchemical Corp.*, 437 F.2d 1336 (9th Cir. 1970). *See generally* Annot., *Refusals to Deal as Violations of the Federal Antitrust Laws*, 41 A.L.R.Fed. 175 (1979).

■ The above authorities effectively show that if Bluff City is found on remand not to possess monopoly power, it could have terminated, with impunity, its relationship with Byars. However, if the court on remand finds that Bluff City does possess monopoly power, added obligations are imposed on the defendant which would not attach in the ordinary refusal to deal context. Should the court on remand find that Bluff City possesses monopoly power, we propose below a framework for its analysis of the abuse of such power in the refusal to deal context.

## A. General Case Law on Refusals to Deal by Monopolists

There exist two conceptually similar lines of cases which impose a duty to deal upon a monopolist. The first is a straightforward "intent" test which originated from *dicta* in *United States v. Colgate & Co., supra*, 250 U.S. at 307, 39 S.Ct. at 468 where the Court stated that a business is free to deal with whomever it pleases so long as it has no "purpose to create or maintain a monopoly." *See also Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 468–69 (1962).

The intent test was applied in *Eastman Kodak Co. v. Southern Photo Materials Co.*, 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684 (1927). There, the Court affirmed a finding of illegal monopolization where a monopolist refused to deal and the jury inferred monopolistic intent because the defendant's policies were "in pursuance of a purpose to monopolize." *id.* at 375, 47 S.Ct. at 404. Kodak had monopoly power over the national wholesale market for certain photographic supplies. It desired to vertically integrate and take over retail distribution of these supplies as well. To that end, it began buying out distributors. One such distributor, however, refused to be bought out. Kodak responded by refusing to sell photographic supplies to the distributor at wholesale prices. From these facts, the jury was permitted to infer an illegal intent to monopolize. *Kodak* comes perilously close to establishing an absolute duty to deal since it permitted a finding of illegal intent where the only evidence of monopolistic purpose was Kodak's desire to buy out retail distributors and its inability to provide an independent business reason for its refusal to deal.

Two other Supreme Court decisions have found refusal to deal by monopolists to be illegal. In *Lorain Journal v. United States*, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951), a newspaper which was indispensable to local businesses refused to sell advertising space to customers who bought advertising on a local radio station. The Court found that this conduct was designed to destroy the competitor and enjoined it as an illegal attempt to monopolize.

In *Otter Tail Power Co. v. United States*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973), the Court found that a private utility company with monopoly power in a wholesale power market had illegally "sought to substitute for competition anticompetitive uses of its dominant economic power." *id.* at 380, 93 S.Ct. at 1031. In addition to supplying wholesale power, Otter Tail also was responsible for providing power at retail to the inhabitants of certain small towns. Otter Tail's wrongful conduct was its refusal to sell power at wholesale

prices or to "wheel" [31] power to municipalities who proposed to replace Otter Tail in the local retail market with their own power companies.

Two lower-court cases have found a monopolist's refusal to deal unlawful because it was done with intent to preserve a monopoly. *See Poster Exchange, Inc. v. Nat'l Screen Service Corp.*, 431 F.2d 334 (5th Cir. 1970), *cert. denied*, 401 U.S. 912, 91 S.Ct. 880, 27 L.Ed.2d 811 (1971) (". . . National Screen intentionally used the monopoly power it had at the manufacturing level to eliminate Poster as a competitor at the distributor-jobber level."); *United States v. Klearflax Linen Looms*, 63 F.Supp. 32, 39 (D.Minn.1945) ("[monopolist] cannot refuse to sell if its design and purpose is to establish a wrongful monopoly.").

There also exists a second, related line of cases which has been styled as promulgating the "bottleneck theory of antitrust law." [32] Under this approach, a business or group of businesses which controls a scarce facility has an obligation to give competitors reasonable access to it. The seminal case is *United States v. Terminal Railroad Assoc.*, 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810 (1912) where a group of railroads acquired ownership over a facility which constituted the only feasible terminal for rail traffic coming to the city of St. Louis from the West.[33] The Court ruled that the terminal owners had to make the facility equally accessible to all users.[34]

In theory, the distinction between the "intent" theory and the "bottleneck" theory is that the former focuses on the monopolist's state of mind while the latter examines the detrimental effect on competitors. In practice, however, there exist many overlapping considerations. This is especially evident in a situation where a monopolist seeks to vertically integrate into a submarket containing only one potential competitor. Since only one competitor is involved, a refusal to deal simultaneously operates as the intentional maintenance of a monopoly as well as the destruction of competition.

---

31. To wheel electricity is to transfer it from one place to another via transmission lines. There were other sources of wholesale power, but Otter Tail would not allow its transmission lines to be used to transfer the power to the municipalities. *See Otter Tail, supra* at 368.

32. *See United States v. Otter Tail Power Co.*, 331 F.Supp. 54, 61 (D.Minn.1971), *aff'd in relevant part*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973); A. Neale, The Anti-Trust Laws of the United States of America 66–69, 127–33 (2d ed. 1970); Note, *Refusals to Deal by Vertically Integrated Monopolists*, 87 Harv.L. Rev. 1720, 1740–52 (1974).

33. Areeda & Turner, *supra* at ¶ 729g would limit these cases to situations where a *group* of competitors obtained a vertically integrated facility. We are not so sure. There may indeed be significant considerations of fairness and efficiency where a single innovative firm builds or obtains a unique facility. However, many such situations arise purely by chance or accident. We question the wisdom of permitting exclusionary behavior by the accidental owner of a unique facility while prohibiting such conduct if the facility is owned by two or more competitors—at least so long as the judicial price regulation problem we discuss below can be overcome.

34. *See also Associated Press v. United States*, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945) (A.P.'s bylaws, restricting membership by competitors of existing members struck down as unreasonable restraint on competition); *Woods Exploration & Pro. Co. v. Aluminum Co. of America*, 438 F.2d 1286, 1303–09 (5th Cir. 1971), *cert. denied*, 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1972) (defendants hindered plaintiff from extracting natural gas from a field by refusing access to transport facilities, pooling arrangements or a right-of-way); *Six Twenty-Nine Productions, Inc. v. Rollins Telecasting, Inc.*, 365 F.2d 478 (5th Cir. 1966) (Local radio station refused to pay normal commission for material prepared by an advertising agency, effectively refusing to deal with it. Reasonableness of station's action an issue of fact); *Packaged Programs Inc. v. Westinghouse Broadcasting Co.*, 255 F.2d 708 (3d Cir. 1958) (Hastie, J.) (Factual issue whether T.V. station's refusal to accept a competitor's film programs was done in the exercise of valid business judgment or to eliminate the competitor); *Gamco, Inc. v. Providence Fruit & Produce Bldg., Inc.*, 194 F.2d 484 (1st Cir.), *cert. denied*, 344 U.S. 817, 73 S.Ct. 11, 97 L.Ed. 636 (1952) (Group of defendants had to provide equal access to their commercially unique building. However, denial of access to a competitor would be proper if done for valid business reasons.).

The overlapping factors are apparent upon examination of *Otter Tail Power Co. v. United States,* 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973). There, the Court found unlawful use of monopoly power where Otter Tail used its monopoly position as a regional supplier of wholesale power to preserve its position as a retail supplier of power in certain towns. Otter Tail refused to deal with certain proposed municipal power systems which needed access to back-up wholesale electricity which only Otter Tail could provide. Otter Tail's conduct, however, was unusually predatory. It refused to allow use of its power lines so that the municipalities could not obtain power from other suppliers. Additionally, it invoked restrictive contract clauses for the same reason. Finally, it engaged in a pattern of harassing litigation against any municipality which desired to set up its own retail power system. Notwithstanding the above, Otter Tail had longstanding dealings with municipalities which had always had their own power companies. Only when a municipality which had previously obtained retail power from Otter Tail proposed to establish its own power system would Otter Tail retaliate.

As can be seen, Otter Tail did much more than simply refuse to deal. Its overall conduct made it plain that it was seeking to destroy a potential competitor in the local retail market. Moreover, Otter Tail could advance no evidence showing that its con-duct was at all beneficial to the public. If anything, the evidence showed the contrary.[35] The only justification offered was self-preservation, and the court rejected that defense.[36] Although the district court in *Otter Tail* relied separately on the "intent test" and the "bottleneck" test, *see* 331 F.Supp. 54, 61 (D.Minn.1971), the Supreme Court's discussion incorporated both in a brief overall analysis. *See* 410 U.S. 366, 377, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973).

### B. Refusals to Deal in Different Factual Situations

Whether the analysis of refusals-to-deal by monopolists is premised on the "intent" test or the "bottleneck" test, there is a discernible uniformity of holdings of illegal refusals-to-deal in various factual contexts.

■ First, there are situations where a monopolist uses its monopoly power in one market to distort competition in another market by refusing to deal. This is forbidden, at least absent a valid business justification for the refusal to deal.[37] *Six Twenty-Nine Prods, Inc. v. Rollins Telecasting, Inc.,* 365 F.2d 478 (5th Cir. 1966); *Packaged Programs, Inc. v. Westinghouse Broadcasting Co.,* 255 F.2d 708 (3d Cir. 1958); *Cf. United States v. Griffith,* 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236 (1948) (Invalidating use of monopoly power in one geographic market to acquire monopoly power in another).[38]

---

**35.** Municipal power systems are preferred customers for cheap Bureau of Reclamation power. If Otter Tail could be made to "wheel" the power, it could be provided more cheaply to consumers than electricity previously obtained from Otter Tail. Indeed, this was the heart of Otter Tail's claim that it properly refused to deal to preserve itself. *See United States v. Otter Tail Power Co.,* 331 F.Supp. 54, 57, 64 (D.Minn.1971).

**36.** The Court did not conclude that self-preservation was an invalid consideration. Rather, it accepted the district court's conclusion that Otter Tail's fears were greatly exaggerated. *See United States v. Otter Tail Power Co.,* 331 F.Supp. 54, 64 (D.Minn.1971), *aff'd in relevant part,* 410 U.S. 366, 380–82, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973).

**37.** On the closely related issue of "price squeezes" by vertically integrated monopolists, see *United States v. Aluminum Co., supra,* 148 F.2d at 436–38; *United States v. Corn Prods. Ref. Co.,* 234 Fed. 964 (S.D.N.Y.1916); *Grand Caillou Packing Co.,* 65 F.T.C. 799, *aff'd in part, rev'd in part, sub nom. La Peyre v. F.T.C.,* 366 F.2d 117 (5th Cir. 1966); Areeda & Turner, *supra* at ¶¶ 728–29.

**38.** *Griffith* contains a famous dictum which also provides a rationale for halting abuse of monopoly power: "the use of monopoly power, however lawfully acquired, to foreclose competition, to gain a competitive advantage, or to destroy a competitor, is unlawful." 334 U.S. at 107, 68 S.Ct. at 945. *Griffith* makes it clear that an exclusionary, anti-competitive use of monopoly power is illegal. *See Pac. Coast Agr. Export Ass'n v. Sunkist Growers, Inc.,* 526 F.2d 1196 (9th Cir. 1975), *cert. denied,* 425 U.S. 959, 96 S.Ct. 1741, 48 L.Ed.2d 204 (1976) (defendant, which had monopoly power over the sup-

■ Second, there is the context in which a monopolist refuses to deal with customers who deal with its rivals. This behavior is inherently anti-competitive; *Lorain Journal, supra,* makes it clear that this is illegal, either as monopolization or attempt to monopolize. *See also North Texas Producers Ass'n v. Metzger Dairies, Inc.,* 348 F.2d 189 (5th Cir. 1965), *cert. denied,* 382 U.S. 977, 86 S.Ct. 545, 15 L.Ed.2d 468 (1966); *Kansas City Star Co. v. United States,* 240 F.2d 643 (8th Cir.), *cert. denied,* 354 U.S. 923, 77 S.Ct. 1381, 1 L.Ed.2d 1438 (1957).

■ Third, there is the context in which a group of competitors control an indispensable facility which cannot be easily duplicated. This is the classic case where the "bottleneck theory" applies. Absent valid business reasons, equal access is required for all.[39] *See United States v. Terminal R.R. Ass'n, supra; Gamco, Inc. v. Providence Fruit & Produce Bldg.,* 194 F.2d 484 (1st Cir.), *cert. denied,* 344 U.S. 817, 73 S.Ct. 11, 97 L.Ed. 636 (1952).

Fourth, there is the most conceptually difficult context of all—that in which a monopolist seeks to vertically integrate. These were the circumstances in *Eastman*

*Kodak Co. v. Southern Photo Materials Co., supra,* where Kodak cut off one of its retail distributors as part of its efforts to vertically integrate into the retail distribution of photography supplies. Likewise, in *Otter Tail Power Co. v. United States,* 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973), Otter Tail, among other things, refused to deal when small towns proposed to replace it with their own retail power systems. In that case, Otter Tail used its monopoly power in the wholesale power market to prevent the displacement of its (natural) monopoly in the local retail power market.

A third case of a refusal to deal as part of a vertical integration plan is *Poster Exch., Inc. v. Nat'l Screen Serv. Corp., supra.* National Screen had a monopoly in the sale of certain movie posters and other paraphernalia. This monopoly arose because as a matter of independent and legitimate business judgment, movie companies preferred to deal only with it to distribute these materials.[40] For years, Poster Exchange had bought materials from National Screen at wholesale prices for resale. The two companies thus competed with one another in the retail distribution market. Subsequently, National Screen refused to deal with Poster Exchange and litigation ensued.

---

ply of oranges, *inter alia,* refused to deal with same firms which competed with it in the distribution of oranges to Hong Kong. "Sunkist's control of supply was employed to extend its monopoly illegally into distribution"); *Smith Kline Corp. v. Eli Lilly & Co.,* 427 F.Supp. 1018 (E.D.Pa.1976) (Higgenbotham, J.), *aff'd* 575 F.2d 1056 (3d Cir.), *cert. denied,* 439 U.S. 838, 99 S.Ct. 123, 58 L.Ed.2d 134 (1978) (defendant misused its monopoly power where it linked the purchase of competitive drugs to drugs over which it had a valid monopoly.) *See also Berkey Photo, Inc. v. Eastman Kodak Co., supra.*

**39.** Cases such as *Donovan v. Pennsylvania Co.,* 199 U.S. 279, 26 S.Ct. 91, 50 L.Ed. 192 (1905) and *Export Liquor Sales, Inc. v. Ammex Warehouse Co.,* 426 F.2d 251 (6th Cir. 1970), *cert. denied,* 400 U.S. 1000, 91 S.Ct. 460, 27 L.Ed.2d 451 (1971), are distinguishable. Those cases upheld the right of a tunnel and terminal, respectively, to give out exclusive contracts for the operation of a business on their premises. Since the tunnel and terminal operators were not competitors of the excluded businesses,

they had no reason to arbitrarily abuse their monopoly position. *See TV Signal Co. of Aberdeen v. AT & T Co.,* 462 F.2d 1256 (8th Cir. 1972). We must concede, however, that there exists tension between these cases and those cases adopting the "bottleneck" theory.

**40.** This was because the national movie companies "have traditionally insisted that licensees to manufacture its accessories have national distribution facilities . . . ." *Poster Exchange, Inc. v. National Screen Service Corp.,* 198 F.Supp. 557, 559 (N.D.Ga.1961), *aff'd,* 305 F.2d 647 (5th Cir. 1962) (opinion granting preliminary injunction). Of course, Poster Exchange (or any other company) could theoretically have set up nationwide distribution facilities to qualify for a license from the national movie companies, but that would have required a "multimillion dollar investment". *Poster Exchange, Inc. v. National Screen Service Corp.,* 431 F.2d at 339. The court held that this was not a reasonable alternative. *id.*

The Fifth Circuit affirmed a finding that National Screen had unlawfully used its monopoly power as a supplier to try to eliminate Poster Exchange as a competitor at the distribution level. Although the court's holding of unlawful refusal-to-deal in *Poster Exchange* was based on a finding of specific intent to exclude, in *dicta*, the court indicated that it might have been sufficient to find that an unlawful monopoly would result as a consequence of National Screen's refusal to deal. 431 F.2d at 388 n. 12.

Bluff City's position in this case is akin to that of National Screen. *See Poster Exch. Inc. v. Nat'l Screen Serv. Corp., supra*. In both cases, industry economics led a group of national companies to deal exclusively with one distributor. Bluff City's refusal to deal as part of a vertical integration scheme is similar to that in *Otter Tail, Kodak* and *Poster Exchange*.[41] And as in *Otter Tail*, there is evidence (albeit so-far uncredited) that Bluff City engaged in other predatory activity. If the district court rules that Bluff City is in fact, a monopolist, application of *Otter Tail, Kodak* and *Poster Exchange* would seemingly result in a quick finding of liability. However, such a quick finding of liability here would void consideration of many factors which militate against imposing an absolute duty to deal on a monopolist in the vertical integration context.

## IV. Refusals to Deal—An Analytical Framework

 We believe that even if Bluff City does possess monopoly power, a finding of liability does not necessarily follow from its conduct here. Although a general intent to monopolize is all that is ordinarily required to find a § 2 violation,[42] cases discussing a monopolist's duty to deal have effectively required a finding of *specific* intent to monopolize. *See Kodak, supra,* 273 U.S. at 375, 47 S.Ct. 400. Indeed, the very basis of the "intent theory" outlined above is specific intent to monopolize. The issue remains what standards should be employed by which to judge Bluff City's behavior.[43]

The "specific intent" standard, most often seen in attempt to monopolize situations, has itself caused problems. Some courts have given weight to the company's subjective state of mind. *See e. g. Southern Blowpipe & Roofing Co. v. Chattanooga Gas Co.,* 360 F.2d 79 (6th Cir. 1966), *cert. denied,* 393 U.S. 844, 89 S.Ct. 126, 21 L.Ed.2d 114 (1968). Other courts have adopted a "fairness" approach to evaluate the monopolist's conduct, measured by in-

---

**41.** Assuming that the district court finds that Bluff City possessed monopoly power, that power extended over wholesale distribution of primary-line periodicals in the Memphis-Shelby County area. Within this market, there existed what can be viewed as a submarket consisting of small retail outlets served by the plaintiff. By refusing to deal with the plaintiff, Bluff City used its power to exclude Byars from the small-store submarket so that it could take over his business—thus vertically integrating into the small-store market.

For the relevant factors which are used in defining a submarket under § 2, *see Brown Shoe Co. v. United States,* 370 U.S. 294, 325, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962); *Spectrofuge Corp. v. Beckman Instruments, Inc.,* 575 F.2d 256, 283–84 (5th Cir. 1978), *cert. denied,* 440 U.S. 939, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1979). In this case both sides recognized the existence of the small-store submarket composed of dis-

tinct customers served by Byars and arranged their business dealings accordingly.

**42.** Further, that intent can readily be found if it is a natural and likely consequence of the monopolist's conduct. *See United States v. Griffith,* 334 U.S. 100, 105, 68 S.Ct. 941, 92 L.Ed. 1236 (1948); *United States v. Aluminum Co. of America,* 148 F.2d 416, 431–432 (1945).

**43.** For an interesting approach to allowable conduct in a situation where two newspapers were engaged in a life-and-death struggle for ascendency in a one-newspaper town, *see Union Leader Corp. v. Newspapers of New England, Inc.,* 180 F.Supp. 125 (D.Mass.1959), *mod'd,* 284 F.2d 582 (1st Cir. 1960), *cert. denied,* 365 U.S. 833, 81 S.Ct. 747, 5 L.Ed.2d 744 (1961). *See also Lamb Enterprises Inc. v. Toledo Blade Co.,* 461 F.2d 506, 514–15 (6th Cir.), *cert. denied,* 409 U.S. 1001, 93 S.Ct. 325, 34 L.Ed.2d 262 (1972).

dustry practice, with allowance made for otherwise improper defensive tactics. *See Union Leader Corp. v. Newspapers of New England, Inc.*, 180 F.Supp. 125 (D.Mass. 1959), *mod'd*, 284 F.2d 582 (1st Cir. 1960), *cert. denied*, 365 U.S. 833, 81 S.Ct. 747, 5 L.Ed.2d 744 (1961). Most courts, however, have been content to adopt standardless language such as "bold, relentless and predatory," *Lorain Journal Co. v. United States, supra* 342 U.S. at 149, 72 S.Ct. 181, 96 L.Ed. 162, while others have examined legitimate business purpose. *See Times-Picayune Publ. Co. v. United States*, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953). One commentator has characterized judicial approaches in this area as falling into one of three categories: (1) the legitimate business purpose approach, (2) the unfairness approach and (3) the gestalt approach. Hawk, *Attempts to Monopolize—Specific Intent as Antitrust's Ghost in the Machine*, 58 Cornell L.Rev. 1121 (1973).

■■■■■ However one characterizes the approaches used, we think it clear that what should matter is not the monopolist's state of mind, but the overall impact of the monopolist's practices. As preservation of competition is at the heart of the Sherman and Clayton Acts,[44] a practice should be deemed "unfair" or "predatory" only if it is unreasonably anti-competitive. In a § 2 case, only a thorough analysis of each fact situation will reveal whether the monopolist's conduct is unreasonably anti-competitive and thus unlawful. *See Berkey Photo, Inc. v. Eastman Kodak Co., supra; California Computer Prod. v. IBM*, (9th Cir. No. 77–1563, decided June 27, 1979); *Greyhound Computer v. I.B.M.*, 559 F.2d 488 (9th Cir. 1977), *cert. denied*, 434 U.S. 1040, 98 S.Ct. 782, 54 L.Ed.2d 790 (1978); *Scott Publ. Co. v. Columbia Basin Publishers, Inc.*, 293 F.2d 15 (9th Cir. 1961).[45]

Courts which have been confronted with joint refusals to deal have carefully analyzed the fact situation before them to see whether defendants' conduct was anti-competitive. *See Neeld v. Nat'l Hockey League*, 594 F.2d 1297 (9th Cir. 1979) (citing cases); *Oreck Corp. v. Whirlpool, supra; E. A. McQuade Tours, Inc. v. Consolidated Air Tour Manual Comm.*, 467 F.2d 178 (5th Cir. 1972), *cert. denied*, 409 U.S. 1109, 93 S.Ct. 912, 34 L.Ed.2d 690 (1973). *See also McCourt v. California Sports, Inc.*, 600 F.2d 1193, 1215 (6th Cir. 1979) (Edwards C. J., dissenting) and cases cited. *Cf. Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979); *Catalano, Inc. v. Target Sales*, 605 F.2d 1097, (9th Cir. 1979). We think that similar analysis is required in a case where there is a unilateral refusal-to-deal by a monopolist.

The anti-competitive impact of the first three refusal-to-deal situations outlined above in Part III B., is obvious.[46] However,

---

**44.** ". . . the policy unequivocally laid down by the [Sherman] Act is competition." *Northern Pac. R. Co. v. United States*, 356 U.S. 1, 4, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). *See also National Society of Prof'l Engineers v. United States*, 435 U.S. 679, 689, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978).

**45.** Careful factual analysis is crucial in examining alleged violations under the rule of reason under § 1 of the Sherman Act, *see Chicago Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 62 L.Ed. 683 (1918), as well as § 7 of the Clayton Act, *see United States v. General Dynamics*, 415 U.S. 486, 94 S.Ct. 1186, 39 L.Ed.2d 530 (1974). *See also Continental T.V. Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 97

S.Ct. 2549, 53 L.Ed.2d 568 (1977) (Vertical restrictions in sale transactions to be judged under a *rule of reason* standard. Although these restrictions may limit intrabrand competition, in many cases economic benefit may result from interbrand competition); *Sandura Co. v. FTC*, 339 F.2d 847 (6th Cir. 1964) (valid business reasons justified vertical territorial restraints.)

**46.** On the issue of arbitrary refusals to deal, *see* 3 Areeda & Turner, *supra* at ¶ 736. *Cf. America's Best Cinema Corp. v. Fort Wayne Newspaper*, 347 F.Supp. 328 (N.D.Ind.1972) (monopoly newspaper publisher could refuse to accept advertising for X-rated films).

the case of the monopolist who seeks to vertically integrate is more difficult. In theory, a monopolist will only take over lower level operations if it is at least as efficient as the lower-level firm. In other words, a monopolist will only vertically integrate if it can do the job cheaper than having someone else do it. If the lower level firm, (i. e. a distributor) is more efficient, it should be able to sell more and thus increase the monopolist-manufacturer's sales. Substitution of a more efficient distributor (the monopolist) for a less-efficient one via a refusal to deal would ordinarily enhance competition in the distribution market.

It also should not make any difference if both levels are natural monopolies. The reason for this is that there exists one profit-maximizing monopoly price to the consumer of any given product. Two rational monopolists dealing with each other in a vertical relationship would set the price at this point and then allocate the monopoly profit between themselves. However, if agreement proves impossible because of misperception, as is likely to be the case, then the probable result will be a price to the consumer higher than the optimal monopoly price. The reason is that the first-level monopolist will charge the second level monopolist a price calculated to maximize its monopoly profit. Faced with this high cost, the second level monopolist will often have no choice but to set its price to the consumer at a correspondingly high level—higher than the optimal monopoly price which the two monopolists would have set had they been able to agree.[47]

In contrast, a single vertically-integrated monopolist has no such problems—it will merely set the price to the consumer at the optimum monopoly level. And to the extent that economies of scale result from the vertical integration, then the consumer will benefit. The monopolist will reap more profit, but the optimal monopoly price to the consumer will be lower. Thus, in many cases, a refusal to deal designed to accomplish vertical integration, without more, should not be a basis for imposing liability. See Areeda & Turner, supra at ¶ 725;[48] Sullivan, antitrust 129–30 (1976). See also Sargent-Welch Scientific Co. v. Ventron Corp., 567 F.2d 701, 712 (7th Cir. 1977), cert. denied, 439 U.S. 822, 99 S.Ct. 87, 58 L.Ed.2d 113 (1978) (monopolist can terminate a dealer on efficiency grounds).

There are situations, however, where a refusal to deal as part of a vertical integration scheme is anti-competitive. That is, 1) where integration facilitates price discrimination so that the monopolist can reap the maximum monopoly profit from different consumers; 2) where integration increases first-level entry barriers so that potential competitors are stymied; and 3) where integration facilitates evasion of regulation of monopoly profits. See Areeda & Turner, supra at ¶¶ 725, 726; Note, Refusals to Deal by Vertically Integrated Monopolists, 87 Harv.L.Rev. 1720 (1974). In such cases, a court should not hesitate to find a § 2 violation. The problem is identifying the proper situation.

---

**47.** To illustrate, with an example taken from Areeda and Turner, supra at ¶ 725c. Assume raw copper ingot costs $40.00 and that the cost of making copper pipe is $35.00. A vertically integrated monopolist with control over both copper ingot and copper manufacturing would set the price of the copper pipe to the consumer at the optimum monopoly level—say $100.00. Where there were two separate monopolists, the one with control over the ingot would set the price of the ingot to the second monopolist at $65.00 so that the former could reap all of the monopoly profit. The second monopolist would now be facing costs of $100.00—$65.00 for the ingot and $35.00 for manufacturing costs. It would set the ultimate price to the consumer at some level above $100.00. Even if the first monopolist were to lower its price to the second monopolist, absent agreement, the ultimate price to the consumer would always be above $100.00.

**48.** Areeda and Turner would find a vertical integration presumptively lawful and would outlaw it only in rare cases.

The situation presented by this case requires careful analysis. There is evidence in the record that Bluff City was not as efficient as Byars and that it imposed a service charge on the small retailers and provided curtailed service to them.[49] This might be viewed as inefficiency-induced price discrimination. It might also be that neither Byars nor Bluff City were rational profit-maximizing monopolists. In addition, although the district court ruled that no competition existed between Byars and Bluff City, that may not be literally true. For an unknown number of retailers, there existed a choice between being served by Byars or Bluff City.[50] At least to this extent, there was always competition between them. It is clear that the national magazine publishers find it in their best interest to deal with only one wholesale distributor.[51] However, some testimony regarding Byars' post-cutoff efforts tends to show that the small retailers benefited greatly when Byars was able to actively compete with Bluff City. The fact that the national distributors found it in their best interest that Bluff City be the only distributor in Memphis does not mean that it is in the public interest. Byars is now competing with Bluff City, is surviving and the market may be benefiting from the competition.

We have listed all of the above as possible factors to be weighed. It is for the district judge, as factfinder, to analyze the evidence and make a determination whether Bluff City's cut-off of Byars was justifiable on efficiency grounds.[52]

This does not end the analysis, however. A finding of anti-trust liability in a case of a refusal to deal should not be made without examining business reasons which might justify the refusal to deal.[53] The rationale for this is that since we tolerate the existence of some monopolists, we must give them some leeway in making business decisions. See *Sargent-Welch Scientific Co. v. Ventron Corp., supra,* 567 F.2d at 711–13 (lawfulness of a monopolist's termination of a dealer depends upon the purpose for which it was done); *Intern'l Railways of Cent. America v. United Brands,* 532 F.2d 231, 239–40 (2d Cir.), *cert. denied,* 429 U.S. 835, 97 S.Ct. 101, 50 L.Ed.2d 100 (1976) (defendant's refusal to deal proper because it "had no reasonable business alternative but to abandon an unprofitable and uncomfortable operation."); *Clark v. United Bank of Denver Nat'l Assoc.,* 480 F.2d 235, 238 (10th Cir.), *cert. denied,* 414 U.S. 1004, 94 S.Ct. 360, 38 L.Ed.2d 240 (1973).

Bluff City argues forcefully that there were valid business reasons for its desire to terminate its relationship with the plaintiff. Bluff City argues that its termination of Byars was motivated by its desire to minimize returns of unsold periodicals and to

---

**49.** *See* n. 26, *supra.*

**50.** *See* n. 29, *supra.*

**51.** *See* n. 23, *supra* and accompanying text.

**52.** The district court may find it useful to hear expert testimony on this issue.

**53.** Although there exist various policy arguments in support of the "business justification defense" to a monopolist's refusal to deal, *see Sargent-Welch Scientific Co. v. Ventron Corp., supra,* 567 F.2d at 712, it is also allowed by the case law. *See Kodak, supra,* 273 U.S. at 375, 47 S.Ct. 400 (by implication); *Gamco, Inc. v. Providence Fruit and Produce Bldg., Inc., su-*

*pra,* 194 F.2d at 487–88. The theoretical justification is that valid business purpose can offset a finding of monopolistic intent. *See United States v. Paramount Pictures,* 334 U.S. 131, 174, 68 S.Ct. 915, 92 L.Ed. 1260 (1948); *Six Twenty-Nine Productions, Inc. v. Rollins Telecasting Inc., supra,* 365 F.2d at 486. *See also* the Fifth Circuit opinion in *Kodak, Eastman Kodak Co. v. Southern Photo Material Co.,* 295 F. 98 (5th Cir. 1923), *aff'd* 273 U.S. 359, 44 S.Ct. 453, 68 L.Ed. 868 (1927). *See generally* the discussion of legitimate business purposes in *Times-Picayune Publ. Co. v. United States,* 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953); *United States v. Columbia Steel Co.,* 334 U.S. 495, 68 S.Ct. 1107, 92 L.Ed. 1533 (1948).

have precise data over its sales and returns. It contends that the stricter control which resulted from its termination of dealings with the plaintiff qualified it for the "affidavit return" privilege which entitled the defendant to merely execute an affidavit as to the number of returns rather than return the actual magazines or covers for credit to the national distributors.[54]

The district court did not address these issues directly although it did state that "exhibit [16] supports the contention of the defendant that one of the reasons the defendant was discontinuing the cash route system with the plaintiff was the failure of the system to produce accurate records which are important to the national distributors in this industry." Exhibit 16 is a letter written by Bluff City to its retail customers announcing that it was terminating its arrangement with Byars and taking over all of his accounts for itself. There is no indication from this exhibit that the reason plaintiff was being terminated was because of inaccurate records or other specific business reasons. It is true that the exhibit states that "during this [changeover], our records may not be entirely accurate and complete." However, there is no indication other than that there would be natural confusion in record-keeping due to the takeover.

■ A monopolist's self-serving, *ex post facto* business justifications must be examined with care. If Bluff City can show that

cutting off the plaintiff was essential to its securing of the "Affidavit return" privilege, then its conduct could be justifiable. However, the district court erred in finding support for this explanation in exhibit 16. We will not attempt to outline the parameters of allowable business justifications for a refusal to deal.[55] Each case must necessarily turn on its own facts. *See Otter Tail, supra,* 410 U.S. at 381–82, 93 S.Ct. 1022, 35 L.Ed.2d 359 (noting that Otter Tail could not be made to deal where that would threaten its ability to serve the public and that the district court retained on-going jurisdiction to give relief should difficulties occur).

Similarly, we think that the district court should carefully examine the alleged "dirty tricks."[56] Predatory conduct on Bluff City's part would go a long way toward establishing a § 2 violation. *See Otter Tail, supra.* For this reason, a careful analysis of alleged misconduct is in order. We agree that plaintiff's evidence on this is somewhat thin. However, it should be examined along with the other factors we have mentioned.

One final factor requires examination— the feasibility of forming a final decree. An injunction ordering a monopolist to deal might enmesh a court in difficult problems of price regulation. In the "bottleneck theory" cases, *supra,* no price regulation problems arose because a court could simply order the owners of a unique facility to treat all customers on equal terms. The

---

**54.** As indicated in n. 4, *supra,* credit for unsold publications is allowed to the retailer by the wholesaler and to the wholesaler by the national publishers. Ordinarily, dealers or wholesalers must return some proof that a magazine was indeed unsold—such as a torn-off cover. Trusted wholesalers, however, are allowed to simply execute an affidavit certifying that a certain number of periodicals were unsold.

**55.** A common justification for anti-competitive behavior is self-preservation. That argument has not been made in this case, but it could be since imposing a broad duty to deal on Bluff

City could result in its replacement by a competitor to which it was forced to sell periodicals at below-wholesale prices. This would be similar to Otter Tail's argument that if it were forced to sell and "wheel" power to any municipality which requested it to do so, then it would be forced out of business. *See* the district court and the Supreme Court discussion of Otter Tail's need-to-survive defense. 410 U.S. 366 at 380–82, 93 S.Ct. 1022 (1973); 331 F.Supp. 54, 64 (D.Minn.1971).

**56.** *See* n. 30, *supra.*

same thing is generally true in any setting in which the monopolist deals with some businesses but refuses to deal with others.

In a case such as this, where there is only one cut-off firm, however, judicial regulation problems abound. In *Otter Tail, supra,* the presence of a regulatory agency—the Federal Power Commission—obviated problems of judicial price setting. *See* 410 U.S. at 375–377, 93 S.Ct. 1022. In the ordinary case, however, the difficulty of setting a price at which the monopolist must deal might well justify withholding relief altogether.[57] In this case, we have a history of previous dealing between the parties where they set a price—10½% below wholesale. As in *Poster Exchange, Inc., supra,* this greatly facilitates the structuring of a decree.[58]

## V. CONCLUSION

Although the record is arguably clear enough for us to rule here, we think that the better course of action is to remand for explicit factfinding and any supplemental proceedings the district court may wish. In assessing whether Bluff City possessed monopoly power and second, whether an unlawful refusal-to-deal took place, the district court should focus on the following: 1) Whether Bluff City can offset the inference of monopoly which accompanies its massive market share; 2) Whether Bluff City's refusal to deal was justifiable on efficiency grounds; 3) Whether other business reasons justified the refusal to

deal; 4) Whether, and to what extent, Bluff City engaged in predatory "dirty tricks",[59] 5) Whether an injunction ordering Bluff City to deal with the plaintiff is feasible.

Vacated and remanded for further proceedings. Appellant shall recover his costs in this court.

---

**57.** Fear of judicial "utility regulation" permeates Areeda & Turner's analysis of monopolists' refusals to deal. We agree that federal judges do not make good regulators of business conduct. However, courts must be careful not to abdicate their responsibilities under the Antitrust laws in the name of expedience. When the adverse effect of allowing a monopolist to maintain certain practices is clear, a court should stay its hand rarely, if ever.

**58.** There exists no theoretical distinction between ordering a monopolist to deal with a former customer and ordering the monopolist to deal with anyone who comes along. Yet, as

a practical matter, it is far different to order the reestablishment of a ruptured relationship than to order a monopolist to deal with a stranger. The difficulty of setting reasonable terms, especially price, should be a substantial factor when confronted with the latter situation. An alternative analytical view would be that there exist valid business reasons why a monopolist should not have to deal with a stranger.

**59.** Findings of fact on this issue would also dispose of Byar's separate claim of unfair competition based on the same alleged "dirty tricks."