**WHITE DIRECTORY OF ROCHESTER, INC.,**
Plaintiff,

v.

**ROCHESTER TELEPHONE CORPORATION,**
Defendant.

No. CIV–89–0192T.

United States District Court,
W.D. New York.

June 5, 1989.

Underberg & Kessler, Rochester, N.Y. (Paul V. Nunes, of counsel) and Senniger,

Powers, Leavitt & Roedel, St. Louis, Mo., for plaintiff (John K. Roedel, Jr., of counsel).

Sullivan & Cromwell, Washington, D.C. (Margaret K. Pfeiffer, of counsel), Josephine S. Trubek, Rochester, N.Y., and Nixon, Hargrave, Devans & Doyle, Rochester, N.Y., for defendant (Michael T. Tomaino, of counsel).

## DECISION AND ORDER

TELESCA, Chief Judge.

### INTRODUCTION

Rochester Telephone Corporation ("RTC") provides telephone service to Rochester, New York and to its surrounding communities. In connection with providing this service, the Public Service Commission ("PSC") requires RTC to publish an alphabetical directory of its telephone subscribers. This directory is the white pages directory, and contains both business and residential listings.

Acting through a publishing company, RTC also compiles and publishes a yellow pages directory.[1] RTC distributes this directory to every household and business that has a telephone, as part of the service for which telephone subscribers pay.

White Directory Publishers, Inc. ("White") is an independent publisher of telephone directories in various cities, including Erie, Pennsylvania and Buffalo, Niagara Falls, and Lockport, New York. In September 1988, White announced its intention to enter the Rochester market, and to publish a directory with an alphabetical list of Rochester businesses and a yellow pages classified advertising section.

White followed the same procedure in entering the Rochester market that it had followed in entering other markets. (In each market, White first spoke with potential advertisers about their reactions to the idea of a second yellow pages directory and visited the Chamber of Commerce for information on the area.) White rented office space in the Rochester area, arranged for telephone service, hired and trained a sales and office staff, planned a sales campaign, found a printer, and found someone to distribute the directory and prepare "cut cards" for use as sales leads. (These cut cards are ads cut from the existing RTC yellow pages directory and pasted on index cards, to be used in soliciting advertisement.)

In its other markets, White has traditionally relied on the telephone companies' published directories rather than obtaining listing information directly from the telephone company. In 1986, however, White licensed listing information from New York Telephone Company for use in publishing its Buffalo directory. White verifies each listing, from whatever source, before entry in its directories.

In late November of 1988, White in a letter to RTC requested a license to purchase certain listing information, contained in a database, which includes the names, addresses, and telephone numbers of all current residential and business subscribers to RTC's telephone service.

On December 12, 1988, RTC refused White's request, citing a long-time RTC policy not to disclose listing information. White's other efforts to secure this information from RTC proving unsuccessful, White filed this action only against RTC, pursuant to § 2 of the Sherman Act, 15 U.S.C. § 2.

White alleges that RTC's refusal to license its listing information violates § 2 of the Sherman Act in two ways: first, White claims that the listing information it seeks is an "essential facility," to which White must have access if it is to compete in the yellow pages market in Rochester and, secondly, White claims that RTC is leveraging impermissibly its telephone service monopoly to maintain a monopoly in the yellow pages advertising market in Rochester. These claims presume that the relevant market for this dispute is the market for yellow pages advertising in the Rochester metropolitan area. White further claims

---

**1.** Until 1986, L.M. Berry & Co. was RTC's representative publishing company in this regard; currently, GTE Directory Sales Corp. performs this function.

that, in this market, RTC has monopoly power, and that the source of its monopoly power is the information which flows to RTC as an incident of its legislatively mandated monopoly in the provision of local telephone services.

White acknowledges that, in the Buffalo market, it has successfully marketed an independent directory without obtaining listing information from New York Tel. White ascribes its ability to succeed without this information to a "scoping advantage" which it enjoys in the Buffalo market, i.e., it provides in a single volume directory information which New York Telephone Company provides in numerous volumes. White states that it would not enjoy a similar "scoping advantage" in Rochester, since its directory would cover substantially the same territory as that currently covered by RTC. In affidavits, White also states that, in the 2½ years since it has operated its Buffalo directory with the listing information from New York Tel, its profits have increased significantly.

While White also claims that "most other telephone companies grant licenses for the use and publication of current listing information," its evidence to substantiate this claim consists of an internal RTC memo stating only that some other telephone companies do sell such listing information.

White has stated that it intends to publish its directory in Rochester, with or without the listing information. Both RTC and White plan to "close out" their books (i.e., stop taking new advertisements) in late summer 1989 and to distribute their respective directories in late fall 1989.

## RELIEF REQUESTED

White seeks a preliminary injunction ordering RTC to provide the listing information at RTC's out-of-pocket cost of transmittal.[2] White argues that without the listing information, it will be unable to publish a complete and accurate directory, and that such inability will so color unfavorably its entry into the Rochester market as to preclude its success, thus constituting irreparable harm. White further argues that it has a substantial likelihood of success on its claim that RTC has impermissibly leveraged its monopoly in local telephone service to control the yellow pages advertising market and/or that RTC has impermissibly denied White access to the essential facility of its current listing information. White also states that the case concerns serious questions presenting a fair ground for litigation and that the balance of hardships tips in its favor.[3]

For the reasons discussed below, I find that White has failed to establish either the threat of irreparable harm or the likelihood of success on the merits of its anti-trust claim. Accordingly, the motion for a preliminary injunction is denied.

## DISCUSSION

White asks this Court to compel RTC to license its listing information at nominal cost, so that White can publish a yellow pages directory at the same time and essentially in the same manner that RTC publishes its directory. White seeks far

---

2. White claims that the cost to RTC of recreating the listing information is about $.40 per listing, and that many major telephone companies provide listings for less than $.40.

3. This final analysis is clearly inapplicable here. White is essentially seeking by preliminary injunction the very relief which it seeks in the suit itself, namely, access to RTC's listing information. An application for such a mandatory injunction requires a greater showing by the moving party. *Jacobson & Co. v. Armstrong Cork Co.,* 548 F.2d 438, 441 (2d Cir.1977). Such an injunction should issue only upon a clear showing that the moving party is entitled to the relief requested, *Flintkote Co. v. Blumenthal,* 469

F.Supp. 115, 125–26 (N.D.N.Y.), *aff'd,* 596 F.2d 51 (2d Cir.1979), or where extreme or very serious damage would result from its denial, *Clune v. Publishers' Association,* 214 F.Supp. 520, 531 (S.D.N.Y.), *aff'd,* 314 F.2d 343 (2d Cir.1963). Even where an application for a preliminary injunction is not deemed to be mandatory, if it in fact seeks substantially all the relief that a plaintiff ultimately seeks, a more stringent standard of proof is required. *Abdul Wali v. Coughlin,* 754 F.2d 1015, 1026 (2d Cir.1985). In either circumstance, then, White must show a substantial likelihood of success on the merits, that is, that its cause is considerably more likely to succeed than to fail. *Id.*

more than the mere maintenance of the status quo *pendente lite*, and, for the reasons discussed *supra* at n. 3, is therefore held to a high standard of proof in order to establish its right to such extraordinary relief. *See Abdul Wali v. Coughlin*, 754 F.2d 1015, 1026 (2d Cir.1985).

### A. *Irreparable Harm*

White claims that, if its first directory in the Rochester market is not as complete, accurate, and up-to-date as that of RTC, its venture into the Rochester market will fail. White insists that complete and immediate access to RTC's listing information is the only means of insuring such completeness and accuracy, and thus avoiding irreparable harm.

Ultimately, White's argument concerns nothing more than timing. While situations may exist where irreparable harm turns on the timing of the receipt of information, this is not one of them. White *will* have access to RTC's current listings, but not until November 1989, when RTC distributes its 1990 yellow pages directory. Nothing would prevent White from using the listings in the RTC 1990 yellow pages directory to compile its own directory. Since White verifies each listing for use in its own directory, a later publication could conceivably be even *more* complete, accurate and up-to-date than the RTC directory, because it could correct for the business listings which have been dropped, changed, or added in the time period between RTC's "closing out" its book and distributing it.

Further undermining White's claim of irreparable harm is the disjunction of the information White seeks and the reasons for which it is sought. White wants RTC's listing information, purportedly because it is complete, accurate and up-to-date. In support of this claimed superiority, White cites to RTC's contract with its printer, which provides for a permissible margin of error of less than 1 percent. That statistic, however, misses the mark: it merely requires the publisher to reproduce faithfully the information given to it by RTC, which itself may or may not be accurate. The import of White's demand is that the information base for its directory must be *exact-*

*ly* like RTC's, warts and all, or the public will reject it. The argument is neither reasoned nor compelling, and is unsupported by any credible expert deposition testimony. "[I]njunctive relief can and should be predicated only on the basis of a showing that the alleged threats of irreparable harm are not remote or speculative but are actual and imminent." *State of New York v. Nuclear Regulatory Commission*, 550 F.2d 745, 755 (2d Cir.1977).

Not only is White's claim of irreparable harm too speculative to support preliminary injunctive relief, but it is also a claim for measurable economic harm which is therefore not irreparable. *Jackson Dairy, Inc. v. H.P. Hood & Sons*, 596 F.2d 70, 72 (2d Cir.1979). White is not threatened with the loss or destruction of good will, *Jack Kahn Music Co. v. Baldwin Piano and Organ Co.*, 604 F.2d 755, 762–63 (2d Cir. 1979), or with the loss of an ongoing business prior to the final adjudication of this case on its merits, *Loveridge v. Pendleton Woolen Mills, Inc.*, 788 F.2d 914, 917 (2d Cir.1986), or with imminent bankruptcy, *Sperry International Trade, Inc. v. Government of Israel*, 670 F.2d 8, 12 (2d Cir.1982). In sum, White pleads no special circumstances which would justify excepting it from the well-settled rule in this Circuit that a preliminary injunction is inappropriate where the potential harm is strictly financial.

### B. *Likelihood of Success on the Merits*

While the preceding conclusion that RTC's refusal to license its listing information does not constitute a threat of irreparable harm to White is in itself sufficient to justify denial of White's motion, I also find such denial proper because White has failed to establish a likelihood of success on the merits of its underlying anti-trust claim.

Like *Byars v. Bluff City News Co., Inc.*, 609 F.2d 843 (6th Cir.1979),

> [t]his case presents intriguing questions of single firm monopoly power under § 2 of the Sherman Anti–Trust Act, 15 U.S. C. § 2. The principal issue presented is one of the most unsettled and vexatious in the anti-trust field: under what cir-

cumstances does a monopolist have a duty to deal?

*Id.* at 846 (footnotes omitted.)

Well-settled rules of law concerning § 2, however, exist to chart a reasoned path through this "unsettle and vexatious" area of the law.

> Section 2 of the Sherman Act provides: Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several states, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished ...

15 U.S.C. § 2.

Illegal monopolization under § 2 of the Sherman Act has two distinct elements: possession of monopoly power in the relevant market and "the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *U.S. v. Grinnell Corp.*, 384 U.S. 563, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966).

 An analysis of the first element of a monopolization claim in itself entails a dual determination: a definition of the relevant market, and a determination as to whether the defendant possesses monopoly power in that market. Monopoly power is "the power to control prices or exclude competition." *Grinnell*, 86 S.Ct. at 1704. A relevant product market is comprised of those commodities "reasonably interchangeable by consumers for the same purposes...." *U.S. v. DuPont*, 351 U.S. 377, 395, 76 S.Ct. 994, 1007, 100 L.Ed. 1264 (1956).

 If this motion turned on an analysis under the first element of a monopolization claim, I would be unable to make a determination on the record as it is presently constituted. The relevant product market must be identified before a party's monopoly power may be determined. *Berkey Pho-*

to, *Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 268 (2d Cir.1979), *cert. denied*, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980). In this case, White claims that the relevant product market is the market for yellow pages advertising in the Rochester area. RTC disputes White's claim, and states that the price for a yellow pages advertising is so shaped by prices for other advertising that the logical product market is the market for all media advertising in the Rochester area. The record provides insufficient evidence from which reasonably to determine the relevant product market, and consequently, insufficient evidence from which to determine RTC's monopoly power in any such market.[4]

The record is not inadequate for purposes of this motion, however, because even assuming RTC to possess monopoly power, this motion turns on an analysis of a form of the willful acquisition or maintenance of monopoly power, namely a monopolist's refusal to deal.

> There exist two conceptually similar lines of cases which impose a duty to deal upon a monopolist. The first is a straightforward "intent" test [under which] a business is free to deal with whomever it pleases so long as it has no "purpose to create or maintain a monopoly"....
>
> There also exists a second, related line of cases which has been styled as promulgating the "bottleneck theory of antitrust law."

*Byars v. Bluff City News Co., Inc.*, 609 F.2d 843, 855–56 (6th Cir.1979) (citations omitted).

The Second Circuit further refined the first line of cases in *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 275 (2d Cir.1979), when it held that a firm violated § 2 of the Sherman Act by using its monopoly power in one market to gain a competitive advantage in another market.

 White claims that RTC has engaged in this impermissible leveraging of its mo-

---

4. Certainly, if the relevant product market is that of yellow pages advertising in the Rochester area, RTC possesses monopoly power. If

however, the relevant product market is the larger market for advertising in the area, it is questionable whether RTC has such power.

nopoly power, in that it has bootstrapped a monopoly in the provision of yellow pages advertising from information it receives incidental to its monopoly in the provision of telephone services.

RTC states, however, that its actions do not constitute monopoly leveraging for two reasons: first, RTC insists that under *Berkey,* monopoly leveraging involves the wrongful use of "monopoly power" alone, that is, the power to control price or to exclude competition, and that in this case, RTC is merely using information which it receives incidental, not to "monopoly power," but merely to its (monopoly) status as the provider of telephone services. Secondly, RTC argues that White's leveraging argument is merely a facet of its essential facilities claim, discussed *infra* at 12.

I find, in accord with the *Berkey* court, that in refusing to license its listing information to White, RTC is simply "reaping the competitive rewards attributable to its efficient size [and does not] offend the Sherman Act [simply because] one of its departments benefits from association with a division possessing a monopoly in its own market." *Berkey,* 603 F.2d at 276; *see also Catlin v. Washington Energy Co.,* 791 F.2d 1343 (9th Cir.1986).

If this listing information were never available to White; if there were not undisputed alternative sources for some, if not all, of the listing information; if White itself did not have a history of successfully compiling and publishing directories without the aid of such listing information; or if the record suggested that RTC licensed this information to some, but not all, competitors, a different result might be demanded. On this record, and for purposes of this motion, I do not find that RTC has wrongfully used its position in the telephone service market to aggrandize its position in the yellow pages advertising market.

■ Similarly, and for similar purposes, I find that RTC's listing information does not constitute an essential facility which RTC is obliged to share with its competitors. *See Flip Side Productions, Inc. v. Jam Productions, Ltd.,* 843 F.2d 1024, 1032 (7th Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 261, 102 L.Ed.2d 249 (1988), and cases cited therein; *cf. U.S. v. Terminal Railroad Association,* 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810 (1912); *Aspen Skiing Co. v. Aspen Highland Skiing Corp.,* 472 U.S. 585, 105 S.Ct. 2847, 2861, 86 L.Ed. 2d 467 (1985); *see also Olympia Equipment Leasing v. Western Union Telegraph,* 797 F.2d 370, 376 (7th Cir.1986), *cert. denied,* 480 U.S. 934, 107 S.Ct. 1574, 94 L.Ed.2d 765 (1987).

In entering the Rochester market for yellow pages advertising, White takes on a competitor whose vertical integration and long history in the market are formidable. At this procedural juncture, their disparate situations "elicit much sympathy but no legal redress." *Byars,* 609 F.2d at 849. Given White's long time experience and success in its own markets, its entry into the Rochester market may and should trigger innovations ultimately beneficial to both consumers and the market entrants. It is this very competition which the Sherman Act mandates and, "[m]indful lest the Sherman Act be invoked perversely in favor of those who seek protection against the rigors of competition[,]" *Berkey,* 603 F.2d at 273, I find that RTC is not compelled to turn over to White its listing information.[5]

WHEREFORE, the motion of plaintiff White Directory of Rochester, Inc., for a preliminary injunction is denied.

ALL OF THE ABOVE IS SO ORDERED.

---

**5.** Having so diposed of this application, I find it neither necessary nor appropriate to determine whether the copyrighted status of RTC's listing information affects its availability to competitors.