**SOAP OPERA NOW, INC., Plaintiff,**

v.

**NETWORK PUBLISHING CORPORA-TION d/b/a Soap Opera Digest, Defendant.**

**No. 88 Civ. 984 (RJW).**

United States District Court, S.D. New York.

May 30, 1990.

Gilbride, Tusa, Last & Spellane, New York City (Eric H. Seltzer, of counsel), for plaintiff.

Battle Fowler, New York City (W. Bruce Johnson, Lori B. Katz, of counsel), for defendant.

## OPINION

ROBERT J. WARD, District Judge.

In a Memorandum Decision filed May 24, 1988, this Court granted the motion of plaintiff Soap Opera Now, Inc. ("SONOW") for a preliminary injunction requiring defendant Soap Opera Digest and its publisher Network Publishing Corporation (collectively, the "Digest") to include plaintiff's advertisements in Soap Opera Digest. The parties subsequently completed discovery, and defendant now moves for summary judgment pursuant to Rule 56, Fed.R. Civ.P. For the reasons that follow, the Court vacates the preliminary injunction, grants defendant's motion for summary judgment with respect to plaintiff's antitrust claims, and dismisses the pendant state claim for lack of subject matter jurisdiction.

## BACKGROUND

The history of the instant litigation is both varied and contentious. Soap Opera Now is a six-page, black and white weekly newsletter, published out of the home of one of plaintiff's principals, which focuses on daytime soap opera news, gossip and coming attractions. Its readership has ebbed and flowed from month to month since its inception in 1983, ranging during 1987, the year preceding the commencement of the instant action, from 5,209 to 6,728. Soap Opera Digest is a well-known bi-weekly, 150–page color soap opera magazine with 350,000 subscribers and a readership of 1,050,000.

From 1983 until November 1987, plaintiff advertised its newsletter in the Digest. During those years, the relationship between the parties was somewhat stormy, with the Digest from time to time threatening to terminate SONOW's ads and imposing various conditions on their continued publication. In November of 1987, the Digest cancelled plaintiff's advertisements, and thereafter, on February 16, 1988, plaintiff moved by order to show cause for a preliminary injunction requiring the Digest to publish SONOW's ads. In its complaint, SONOW alleged that the Digest was guilty of an illegal attempt to monopolize trade in violation of § 2 of the Sherman Antitrust Act of 1890, as amended, 15 U.S.C. § 2 (1982), and damages resulting therefrom.[1] In addition, the complaint alleged that the Digest, by its refusal to publish SONOW's ads, had breached an alleged contract between the parties.

On February 19, 1988, the Court heard oral argument on plaintiff's motion for a preliminary injunction. Finding that plain-

---

**1.** SONOW later amended its complaint to add a claim of illegal monopolization.

tiff had adequately demonstrated irreparable injury, a balance of hardships tipping decidedly in its favor, and sufficiently serious questions going to the merits to make them a fair ground for litigation, the Court granted plaintiff's motion and directed defendant to permit SONOW to advertise in the Digest during the pendency of the action at the same rates that it charged for ads by similar publications.[2]

According to plaintiff, the Digest is the dominant entity in the relevant market, which it defines as "the market for the mass dissemination of soap opera news," consisting of "subscribers and potential subscribers of soap opera publications." Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment, filed December 8, 1988, at 9 ("Plaintiff's Opposition Brief"). Plaintiff contends that the Digest's share in this market is approximately 80 percent. Defendant, on the other hand, asserts that the relevant market should be more broadly defined to include general interest publications that regularly feature soap opera news, such as *TV Guide.* Thus, it claims, the market share of the Digest is not nearly so great as alleged by plaintiff. Further, defendant argues that plaintiff has failed to present any evidence to support its claim that it and the Digest are in the same relevant market.

Defendant has submitted evidence suggesting that no barriers exist to entry into the relevant market, even as narrowly defined by plaintiff. It is undisputed that the actual product—soap opera news—is readily available to potential publishers from the networks. In addition, in order to start a newsletter one needs only "good writers, an organization to produce and assemble it and mail it promptly and access to a place to promote it." Appendix to Defendant's Motion for Summary Judgment at 216 ("Def. App.") (Deposition of Kenneth

Stein). In fact, SONOW was begun with a very small initial capital investment. It is further undisputed that several soap opera publications, in addition to the Digest, have either existed for several years or have recently been started. These publications do not advertise in the Digest. Plaintiff, however, asserts that the competing publications are either very small, very unstable, or infrequently published in comparison to the Digest.

The gravamen of plaintiff's claim is that it will be unable to compete successfully, or indeed to survive, in the relevant market unless it is able to advertise SONOW in the pages of the Digest. Thus, plaintiff argues that the Digest's advertising pages constitute an "essential facility" in the relevant market. According to plaintiff, past attempts to promote its product in other media have been unsuccessful. Although SONOW concededly places ads in some of the smaller and newer soap opera magazines, it claims that these are not sufficient to maintain it as a viable entity for any length of time, although it admits that ads placed in a recent market entrant, Soap Opera Update, have been profitable. SONOW has never done demographic or market studies in an attempt to discover alternate methods of reaching its target audience, which it defines as soap opera "fanatics." It is plaintiff's contention that all of these "fanatics" read the Digest, and indeed that all of its readers are also Digest readers.

Defendant insists that, even if plaintiff were able to demonstrate that the Digest has monopoly power in the relevant market, it is not an essential facility both because other competitors in the market are able to survive without advertising in the Digest, and because there exist alternative methods by which SONOW can reach its audience—namely, those methods used by

---

**2.** This directive alone produced a flood of letters between the parties and to the Court, with the parties unable to agree on appropriate price and payment terms for the SONOW ads. The parties ultimately entered into an escrow agreement, pursuant to which SONOW agreed to pay into an escrow account the differential between the normal rate card price and the discount price to which SONOW claimed it was entitled, pending the final outcome of the case. Subsequent allegations of late payments, improper placement of the ads, and disputes over the propriety of the escrow agreement's continued application have constituted a continuing saga in the tortured history of this case.

the Digest itself, as well as other promotional techniques available to newsletters, including direct mailings and flyers. The Digest intimates that SONOW's out-of-hand rejection of various alternate marketing vehicles is insufficient to support the instant claims, and demonstrates only that SONOW wishes to take advantage of the Digest's aggressive marketing techniques by reaching its readers without investing the resources that other competitors in the market must expend.

Plaintiff's antitrust claims ultimately rest on its contention that a black and white newsletter such as SONOW, which contains no advertising pages and has a relatively tiny circulation, cannot survive as a viable entity using the same types of promotion and marketing techniques as the Digest, a "gorgeous" four-color magazine. According to plaintiff, the only way that a small newsletter such as Soap Opera Now can remain a viable competitor in the market for the mass dissemination of soap opera news is to reach its target consumers by advertising in the publication which plaintiff insists they all read—the Digest.

## DISCUSSION

### I. *Summary Judgment.*

The standards for granting summary judgment in this Circuit are well-established. A court may grant this extraordinary remedy only when it is clear both that no genuine issue of material fact remains to be resolved at trial and that the movant is entitled to judgment as a matter of law. In deciding the motion, the Court is not to resolve disputed issues of fact, but rather, while resolving ambiguities against the moving party, to assess whether material issues remain for the trier of fact. *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–50, 106 S.Ct. 2505, 2509–11, 91 L.Ed.2d 202 (1986)). Only where the entire record would inevitably lead a rational trier of fact to find for the moving party is summary judgment warranted. *National*

*Railroad Passenger Corp. v. City of New York*, 882 F.2d 710 (2d Cir.1989).

Although the movant faces a difficult burden to succeed, motions for summary judgment, properly employed, permit a court to terminate frivolous claims and defenses, and to concentrate its resources on meritorious litigation. *Knight v. U.S. Fire Ins. Co., supra*, 804 F.2d at 12. The motion thus:

> is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action." Fed. Rule Civ. Proc. 1.... Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986).

While the party seeking summary judgment bears the initial burden of demonstrating the lack of material factual issues in dispute, *Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 9 (2d Cir.1983), "[t]he non-movant, ... who must sustain the ultimate burden of proof, must demonstrate in opposing the summary judgment motion that there is some evidence which would create a genuine issue of material fact." *Delaware & Hudson Railway Co. v. Consolidated Rail Corp.*, 902 F.2d 174, 177–178 (2d Cir.1990) (citing *Celotex Corp. v. Catrett, supra*, 477 U.S. at 322–23, 106 S.Ct. at 2552). "Conclusory allegations will not suffice to create such a genuine issue. There must be more than a 'scintilla of evidence', *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986), and more than 'some metaphysical doubt as to the material facts.' *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)."

*Twin Laboratories, Inc. v. Weider Health & Fitness,* 900 F.2d 566, 568 (2d Cir.1990). With the foregoing principles in mind, the Court turns to the instant motion.

## II. *The Antitrust Claims.*

Plaintiff's amended complaint contains two substantive antitrust counts, consisting of a claim of illegal monopolization and a claim of attempted monopolization, both in violation of § 2 of the Sherman Antitrust Act, 15 U.S.C. § 2 (1988). The amended complaint alleges that the Digest attempted to monopolize the market for soap opera publications by refusing to deal with plaintiff, and that the Digest illegally monopolized this market by its refusal to deal. Both of its antitrust claims thus rest entirely upon plaintiff's assertion that, because of its position in the alleged relevant market, defendant had a duty to deal with SONOW and thus that its refusal to deal constitutes anticompetitive or exclusionary conduct in violation of section 2.[3] Because of the confusion that often surrounds this area of law, and the consequent ease with which a "plaintiff denied access to a firm's goods, services or resources may characterize that which he desires as an 'essential facility' and claim that its denial violates the antitrust laws," P. Areeda & H. Hovencamp, III *Antitrust Law* 677 (1988 Supp.), it is instructive first to set out the basic contours of the law regarding refusals to deal.

■ It has been said that questions concerning the circumstances under which a single firm monopolist has a duty to deal with other firms are some of the "most unsettled and vexatious in the antitrust

field." *Byars v. Bluff City News Co., Inc.,* 609 F.2d 843, 846 (6th Cir.1979). In various cases, courts have found refusals to deal by single firm monopolists actionable under § 2. In the context of a claim of illegal monopolization, a refusal to deal may constitute a form of "willful acquisition or maintenance of [monopoly] power," satisfying the second element of a monopolization claim. *See White Directory of Rochester, Inc. v. Rochester Telephone Corp.,* 714 F.Supp. 65, 69 (W.D.N.Y.1989).[4] A refusal to deal with a competitor may also comprise an element of a claim of attempted monopolization under § 2. *See, e.g., Twin Laboratories, Inc. v. Weider Health & Fitness, supra,* 900 F.2d at 570–71.[5] In fashioning the various doctrinal frameworks in which refusals to deal with competitors may amount to violations of § 2, courts have likely been mindful of the Second Circuit's observation that:

> [i]n passing the Sherman Act, Congress recognized that it could not enumerate all the activities that would constitute monopolization. Section 2, therefore, in effect conferred upon the federal courts "a new jurisdiction to a apply a 'common law' against monopolizing." 3 P. Areeda & D. Turner, *Antitrust Law* 40 (1978).

*Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 272 (2d Cir.1979), *cert. denied,* 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980).

As this "common law" of monopolization has evolved, the situations in which a refusal to deal by a monopolist may violate § 2 have grouped themselves around several

---

**3.** In its amended complaint, SONOW refers to "exclusionary and predatory conduct, including, but not limited to," defendant's refusal to deal with plaintiff. However, no other anticompetitive or predatory conduct has been either alleged or supported in any way by the facts uncovered during discovery, and therefore plaintiff's claim must be understood to rest only upon the allegedly wrongful refusal to deal.

**4.** The offense of monopolization under § 2 of the Sherman Act consists of two elements: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence

of a superior product, business acumen, or historical accident." *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966); *Delaware & Hudson Railway Co. v. Consolidated Rail Corp., supra,* 902 F.2d at 178.

**5.** "To make out a successful claim of attempted monopolization, a plaintiff must demonstrate: (1) anti-competitive conduct; (2) intent to monopolize; and (3) a dangerous probability of obtaining monopoly power." *Delaware & Hudson Railway Co. v. Consolidated Rail Corp.,* 902 F.2d 174, 180 (2d Cir.1990).

formulae. The Sixth Circuit, in *Byars*, described the groupings of cases as follows:

[t]here exist two conceptually similar lines of cases which impose a duty to deal upon a monopolist. The first is a straightforward "intent" test [under which] a business is free to deal with whomever it pleases so long as it has no "purpose to create or maintain a monopoly"....

There also exists a second, related line of cases which has been styled as promulgating the "bottleneck [or essential facilities] theory of antitrust law." Under this approach, a business or group of businesses which controls a scarce facility has an obligation to give competitors reasonable access to it.

*Byars v. Bluff City News Co., Inc., supra,* 609 F.2d at 856.

The "essential facilities" doctrine described by the *Byars* court is often treated as a distinct claim under § 2. In the instant case, however, plaintiff did not plead an "essential facilities" count in its complaint, but instead relies on the essential facilities doctrine as a theory supporting its monopolization and attempt to monopolize claims. Although it is clear that a separate test is applied in evaluating claims under the essential facilities doctrine, this Court finds it analytically more helpful to conceive of the essential facilities doctrine as constituting not a distinct claim under § 2, but instead either as a form of, or evidence of, a firm's "willful acquisition or maintenance" of monopoly power in satisfaction of the second element of a monopolization claim, or in certain situations as an element of an attempt claim.

There are several reasons for this approach. As a practical matter, it is helpful for courts to keep in mind that, in evaluating any essential facilities claim involving a single firm, the possessor of the facility must first be found to be a monopolist. *See MCI Communications Corp. v. American Tel. & Tel. Co.,* 708 F.2d 1081, 1132–33 (7th Cir.) (first element of four part essential facilities test is "control of the essential facility by a monopolist"), *cert. denied,* 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983); *Twin Laboratories, Inc. v. Weider, supra,* 900 F.2d at 569 (assuming for purposes of essential facilities discussion that defendant possessed monopoly power in relevant market). In effect, this requirement coincides with the first prong of the *Grinnell* test. Furthermore, although the doctrine has never been explicitly relied on by the Supreme Court, in those cases in which the Supreme Court has found a duty on the part of a single firm to share an essential product or service with its competitors, it has done so either under the rubric of the second prong of the *Grinnell* monopolization test, *see Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985) (record supported inference that refusal to deal was "predatory," constituting willful maintenance of monopoly power as distinguished from legitimate growth or development), or as constituting an attempt to monopolize. *See Otter Tail Power Co. v. United States,* 410 U.S. 366, 377, 93 S.Ct. 1022, 1029, 35 L.Ed.2d 359 (1973) (refusal to deal part of a scheme of use of monopoly power to destroy threatened competition, in violation of the "attempt to monopolize" clause of § 2); *Lorain Journal Co. v. United States,* 342 U.S. 143, 154, 72 S.Ct. 181, 187, 96 L.Ed. 162 (1951) (same). *See also United States v. Terminal Railroad Ass'n,* 224 U.S. 383, 409, 32 S.Ct. 507, 515, 56 L.Ed. 810 (1912) (where inherent conditions of railroad market are such as to prohibit any other reasonable means of entering a city, combination of every terminal facility under the exclusive ownership and control of less than all of the companies under compulsion to use them is a violation of § 1 as well as an attempt to monopolize under § 2).

■■■■ As the latter set of cases makes clear, a refusal to deal may amount to an attempt to monopolize when a firm with monopoly power in one market attempts through the use of that power to monopolize a related or downstream market. To withstand summary judgment on a claim of attempt to monopolize a second market by leveraging a monopoly position in a first market, a plaintiff must demonstrate that the defendant "(1) intended to monopolize

the [second] market; (2) engaged in conduct designed to carry out that intent; and (3) had a 'dangerous probability' of success." *Twin Laboratories, Inc. v. Weider Health & Fitness, supra,* 900 F.2d at 570.

Finally, some courts have suggested that the last element of the attempt test—a dangerous probability of success—may not have to be proven by a plaintiff under a theory of "monopoly leveraging," which is sometimes seen as a distinct § 2 cause of action. This theory:

> holds that it is an act of monopolization for a firm having monopoly power in one market to exploit that power as a 'lever' to secure competitive advantages in a second market, irrespective of the degree of market power actually achieved by the defendant within the second market.

*In re Air Passenger Computer Reservations Systems Antitrust Litigation,* 694 F.Supp. 1443, 1472 (C.D.Cal.1988) (rejecting monopoly leveraging as distinct § 2 claim). The case most often cited as recognizing the monopoly leveraging theory is *Berkey Photo, Inc. v. Eastman Kodak Co., supra,* 603 F.2d at 276, in which the Second Circuit stated in dictum that "the use of monopoly power in one market to gain a competitive advantage in another is a violation of Section 2, even if there has not been an attempt to monopolize the second market." *Id.* Recently, however, the Second Circuit has called into question the applicability of this dictum to non–"tying" cases, and has reaffirmed that there remains in any case the requirement of "tangible harm to competition." *See Twin Laboratories, Inc. v. Weider Health & Fitness, supra,* 900 F.2d at 571.

1. the market or markets at issue—

Having set out the various doctrinal frameworks within which a firm's refusal to deal may be actionable under § 2, the first step in the Court's analysis must be to define the relevant market or markets involved in this case. *See, e.g., United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 391–93, 76 S.Ct. 994, 1004–06,

100 L.Ed. 1264 (1956). To say that the various market formulations propounded by the parties have been confused would be kind.

"The relevant market consists of the geographic market—the location in which a potential buyer may rationally seek specific goods or services—and the product market, the boundaries of which are set by the 'reasonable interchangeability of use or the cross-elasticity of demand.'" *Metropolitan Life Ins. Co. v. Adler,* No. 87 Civ. 2632, slip op., 1988 WL 13725 (S.D.N.Y. February 11, 1988) (available on Lexis at 1988 U.S. Dist. LEXIS 1146).

In the instant case, it is undisputed that the relevant geographic market is a national one. Plaintiff alleges variously that the relevant product market consists of (1) publications devoted solely to soap opera news, (2) the mass dissemination of soap opera news, and (3) subscribers or potential subscribers to soap opera publications. Defendant, too, fluctuates in its assertions of the relevant market. At times it argues that certain general interest publications which contain soap opera news in addition to other types of news should be included based upon the fact that these publications compete with the Digest for both advertisers and supermarket check-out space,[6] as well as the fact that they contain some soap opera news. In other instances, defendant defines the market with reference to the total number of soap opera viewers in the United States.

As noted above, both plaintiff and defendant at times describe the relevant market in terms of the "subscribers and potential subscribers of soap opera publications," *e.g.,* Plaintiff's Opposition Brief at 9, rather than the actual product. Defendant thus suggests that the entire audience of soap opera viewers, which plaintiff agrees numbers at least 60 million, should be counted in the relevant market in determining the Digest's market share. Such an approach is erroneous. *See Redmond v. Missouri Western State College,* No. 84–6139–CV–

---

**6.** These arguments confuse the Digest's competition in the market for the service of advertisements—a product distinct from that of soap opera magazines—with its competition in the market in which it is alleged by plaintiff to be a monopolist.

SJ–6, slip op., 1988 WL 142119 (W.D.Mo. November 2, 1988) (available on Lexis at 1988 U.S. Dist. LEXIS 12230) ("An attempt to define the relevant market in terms of a certain class of prospective purchasers runs contrary to the classic tests used in a monopolization case").

■ For antitrust purposes, a product market consists of a class of products—either goods or services—which are reasonably interchangeable with one another such that producers of the products "have the ability ... to take significant amounts of business away from each other." *Smithkline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056, 1063 (3d Cir.), *cert. denied*, 439 U.S. 838, 99 S.Ct. 123, 58 L.Ed.2d 134 (1978). Although it is proper to identify the ultimate consumer of the product in order to make a determination as to whether two products are reasonable substitutes for one another (i.e. whether two products enjoy cross-elasticity of demand), and therefore are in the same product market, *see Levitch v. Columbia Broadcasting System, Inc.*, 495 F.Supp. 649, 664 (S.D.N.Y.1980), *aff'd*, 697 F.2d 495 (2d Cir.1983), a definition of the market itself which consists of consumers or potential consumers may, as here, obfuscate the issues of monopoly power and reasonable interchangeability.[7]

■ In the instant case, plaintiff, having completed discovery, has utterly failed to present any evidence which demonstrates that it competes with the Digest in any relevant antitrust market. In fact, all of the evidence adduced during discovery, in-cluding the uncontradicted statements of plaintiff's president and secretary, indicates that exactly the opposite is true.

As noted above, for two products to be included in the same relevant market for antitrust purposes, they must be reasonably interchangeable in the eyes of the ultimate consumer of the product. Here, both parties have defined consumers of their respective products as subscribers or potential subscribers to publications devoted to soap opera news. The parties agree that this group consists of some or all of the millions of viewers of television soap operas. However, as discussed previously, the mere fact that two products are targeted at the same consumer group does not compel the conclusion that the products are reasonable substitutes for one another—i.e. that they are in the same relevant antitrust market.[8] Here, the undisputed evidence suggests that although SONOW and the Digest are both aimed at some segment of the soap opera viewer population, they are not reasonably interchangeable and thus are not competitors in the same relevant market.

Kenneth Stein ("Stein"), the president of plaintiff, stated in deposition testimony that it was "obvious" to him that SONOW's "readers are not the soap viewer. They are the great soap fan or even fanatic and it is obvious ... that *every one of them will buy the 150–page four color gorgeous Soap Opera Digest before they will buy our six-page black and white.*" Deposition of Kenneth Stein, Appendix to Defendant's Motion for Summary Judg-

---

7. For example, it is impossible to determine whether two products are reasonably interchangeable, and therefore in the same market for antitrust purposes, when the market is defined as a group of potential purchasers rather than as a product. The confusion in this case may be related to fact that many of the witnesses and parties have advertising backgrounds, where it is customary to define a market as a group of target purchasers of the product being advertised. Thus, Kenneth Stein of SONOW notes that the "market" for SONOW consists of soap opera "fanatics." However the term "relevant market" has a very different and specific meaning in the context of antitrust analysis, as previously noted. Products targeted *at the same advertising "market"* may nonetheless be in entirely different antitrust markets.

8. For example, a magazine devoted solely to articles and information of interest to golfers would presumably reach a consumer group consisting of golf enthusiasts. Products also bought by this group, such as golf clubs, balls, and tees, would clearly not be in the same relevant market notwithstanding their having an identical consumer. These products would not by any stretch of the imagination be reasonable substitutes for one another from the perspective of those consumers. Thus, even a monopolist golf magazine would be free to refuse to accept advertising from a golf ball producer without incurring § 2 liability for illegal monopolization.

ment ("App.") at 366 ("Stein Dep.") (emphasis added). At another point in his deposition testimony, Stein explained that SONOW's readers consist of soap opera viewers who "have an extra interest in the subject." Likening the situation to that of a sports "fanatic" who, in addition to reading Sports Illustrated, would look for other sources of sports news in order to supplement the news in that magazine, App. at 328–29, he stated that all of those soap viewers who are interested enough in soap operas to read a newsletter such as SONOW would "for sure" also read the Digest. App. at 166. Thus, Stein stated that SONOW "can't be first choice," because it is "a six-page black and white as opposed to a 150–page four-color magazine." App. at 329.

In another instance during Stein's deposition, which makes it all the more clear to the Court that plaintiff's monopolization claim is premised upon inconsistent and ultimately irreconcilable assertions,[9] Stein insisted that "if [a soap opera viewer is] not going to read Soap Opera Digest, they are not going to read Soap Opera Now." Stein was then asked whether he considered SONOW "the same type of publication as Soap Opera Digest," to which he replied "[y]es and no." In describing the differences between the two publications, he said that SONOW's news is more current than that of the Digest since it is published every week, whereas the Digest takes six to eight weeks to publish. Prompted by this answer, the attorney for defendant then initiated the following key exchange:

Q. Why wouldn't a viewer who is interested in what is going to happen next week on their soap, who is not interested in the six-week old news that you claim is published in the Digest read your newsletter instead?

. . . . .

MR. OCCHIPINTI (counsel for plaintiff): Objection to the form of the question. I don't know that we have established that there aren't viewers who are or aren't interested in Soap Opera Now. I don't follow the question.

MS. KATZ (counsel for defendant): Mr. Stein just testified that he is basing his conclusion that all the people who watch soap operas are not potential subscribers to soap opera magazines because if they were potential subscribers, they would subscribe to Digest.

My question to him is—and then he claims that his news is more current. So a viewer who is interested in the most current news and doesn't find that in Digest and doesn't read or subscribe to Digest could still be interested in your newsletter; is that correct?

A. No.

Q. Why not?

A. Because current though it may be, it is only a couple of pages and it doesn't compare to 150 pages with color photographs. It just doesn't.

Q. Is it your contention that nobody who does not read Digest reads your newsletter?

A. I believe that.

App. at 369–70.[10]

In effect, Stein thus testified that a person would not purchase SONOW *instead* of the Digest, but only *in addition* to it. Under these circumstances, it is clear that the two publications are not competitors as that term is understood in the context of the antitrust laws.

---

**9.** In support of its "essential facilities" theory, which underlies all of plaintiff's antitrust claims, plaintiff asserts that all of its readers and potential readers are also readers of the Digest. For this reason, advertisement in the Digest is obviously an extremely efficient method for SONOW to reach its targeted consumer market, and plaintiff asserts that such advertisement is in fact the only method for reaching these consumers that is not cost prohibitive for a small weekly publication such as itself. However, as noted previously, in stressing the effec-

tiveness of the Digest in this manner, plaintiff has undermined any argument that it might have had that it is a competitor of the Digest in the sense contemplated by the Sherman Act.

**10.** *See also* App. at 46 (letter of Michael Kape) (stating that SONOW fills a gap which Digest cannot, and that SONOW "obviously" does not compete against the Digest, but only against the few other weekly newsletters being published).

Nor, drawing all inferences in favor of plaintiff, can SONOW reasonably be considered even a potential or future competitor of the Digest.[11] Both Stein and Michael Kape ("Kape"), Stein's partner and Secretary of plaintiff, have stated that their strategy in running plaintiff was to keep it small. Explaining the reasons for their rejection of certain marketing techniques successfully employed by other soap opera publications, such as supermarket checkout or newsstand sales, or utilization of Publishers' Clearinghouse ("PCH"), they stated that these marketing methods are not feasible for a small weekly newsletter, and that they did not desire that SONOW become a qualitatively different publication from what it was.[12] For example, Stein stated in an affidavit, filed May 21, 1990, that SONOW "must remain small to be physically able to serve our market [13] and

therefore cannot be a risk to these large corporations" (i.e. "the Digest or Soap Opera Weekly"). *See, e.g.*, App. at 349–50 (Stein Dep.).

■ The Court's inquiry, however, does not end with its determination that the evidence in the record cannot fairly support an inference that SONOW is a competitor or potential competitor of the Digest in the market in which the Digest arguably is a monopolist—a market consisting of soap opera magazines and products reasonably interchangeable with soap opera magazines.[14] A monopolist's refusal to deal with a non-competitor plaintiff in the monopoly market may still violate § 2 if the monopolist competes with the plaintiff in a second market, *see* discussion of monopoly leveraging, *supra*, or if the refusal to deal is directed at influencing the plaintiff not

**11.** In its Memorandum Decision granting plaintiff's motion for a preliminary injunction, the Court noted that SONOW had raised a substantial question as to whether the Digest could be said to constitute an essential facility in part because at that preliminary stage of the proceedings "[i]t appear[ed] that . . . without advertising in [the Digest], SONOW is unable to make its own publication into an effective substitute." *Soap Opera Now, Inc. v. Network Publishing Corp.*, 88 Civ. 984, at 8, 1988 WL 168300. Subsequent discovery, however, has failed to support the Court's initial view that SONOW could be a potential substitute for the Digest.

**12.** The Court does not mean to suggest that a small company cannot compete in the same relevant market as a large one, or that it must have a reasonable possibility of growing large in order to have a claim under § 2. Indeed, such a position would be ridiculous in light of the goals and policies of the Sherman Act. In the instant case, however, plaintiff is not a small company producing the same product as a larger monopolist. Instead, it consists of a qualitatively different product which is not a reasonable substitute for defendant's product. Under these circumstances, it is necessary to ask whether, in the market in which the Digest competes, small newsletter-type products may evolve (absent illegal use of monopoly power) into substitute products, and whether plaintiff is such a potential competitor. The evidence presented on this motion for summary judgment allows no reasonable inference that the answer to these inquiries is anything other than a negative one.

**13.** In the previous paragraph, Stein had explained that accurate "sneak peeks," (coming attractions) "are only possible if done by a small

concern like ours" because of the very small lag time between printing and delivery. He noted that the larger publications, such as defendant, necessarily take much longer to reach the consumer. He postulated that, because SONOW is thus able to "beat them every week" with respect to this future news, these publications desire to "crush [SONOW] out of business." Stein Aff. at 5. However, as noted above, Stein also insists that plaintiff's readers read SONOW in addition to, and not instead of, the Digest. In this context, use by Stein of the term "our market" makes clear that plaintiff and defendant's publications serve different, though related, markets.

**14.** The Court has serious reservations about whether plaintiff has even raised a factual question on the issue of defendant's monopoly power in the market in which it as a magazine competes. Putting aside disputes over whether other sources of "the mass dissemination of soap opera news," such as the soap opera news service in the Prodigy computer software and the local and national soap opera telephone services, are in the same relevant market as the Digest, defendant has arguably rebutted any inference of monopoly power arising from its alleged market share with substantial evidence of low or nonexistent entry barriers. Plaintiff has failed to come forward with any tangible evidence of entry barriers in this market, beyond the assertion that soap opera magazines often go out of business or are published sporadically. However, in light of the large alleged market share of the Digest, the Court will assume for purposes of this Opinion that the Digest exercises monopoly power in the market including the product of soap opera magazines.

to deal with a competitor of the defendant in some market. *E.g. Lorain Journal Co. v. United States*, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951) (monopolist newspaper refused to deal with advertisers who also advertised on competing radio station). The latter situation is not at issue in this case, however the leveraging question must be addressed.

### 2. monopoly leveraging—

Although only alluded to by plaintiff, SONOW's antitrust claims could conceivably be based upon a theory of "monopoly leveraging," that is, that defendant by refusing to deal with plaintiff was attempting to use its alleged monopoly power in one market to gain a competitive advantage in a second market. *See, e.g., Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir.1979), *cert. denied*, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980). Plaintiff's president, Stein, opined as much in one of his several *ex parte* letters to the Court, in which he alleged that the Digest had begun a weekly publication, and had attempted to hire SONOW's editor to write for the new magazine. Like the solution to a Friday afternoon cliffhanger, the "reason for [defendant's] actions" was at last known to Stein.

■ Although there is some evidence in the record demonstrating that at one time several years ago the then publisher of the Digest considered starting a newsletter, no competing newsletter was ever started. On these undisputed facts, a claim of monopoly leveraging, even if it had been prop-

erly pleaded, would be far too speculative to survive a motion for summary judgment. There is clearly no question that a "dangerous probability" of monopolization of the second market has not been shown, since defendant never published any competing newsletter. *See Twin Laboratories, Inc. v. Weider Health & Fitness, supra*, 900 F.2d at 570–71 (no dangerous probability as a matter of law where defendant's share of the secondary market in which it competed with plaintiff was at best 25%).

■ Further, even if, as discussed above, the "dangerous probability" element need not be shown in a leveraging case under *Berkey Photo*, plaintiff does need to demonstrate some "competitive advantage" gained by defendant in the second market. *Berkey Photo, Inc. v. Eastman Kodak Co., supra*, 603 F.2d at 284 (improper, absent justification, for firm with monopoly power in one market to gain a competitive advantage in a second market by refusing to deal). In light of the undisputed fact that defendant in this case never began any competing publication,[15] that showing cannot be made.

### 3. essential facilities—

■ Even assuming that the Digest possesses monopoly power in its product market, plaintiff's monopolization and attempted monopolization claims premised upon an essential facilities theory must fail. As discussed above, plaintiff's attempt claim is deficient because SONOW and Digest do not compete in any market. For the same reason, any other possible claim under an

**15.** During the pendency of the instant motion, the Digest was sold by defendant to News America Publishing Inc ("News America"). Subsequently, SONOW instituted an action against this new owner of the Digest, captioned *Soap Opera Now, Inc. v. News America Publishing Inc.*, 90 Civ. 2631 (RJW). There is evidence in the record that the defendant in this latter action has begun a weekly soap opera magazine, which contains certain types of features, for example coming attractions, also contained in SONOW. Without the benefit of any argument or evidence on the issue, the Court is unable to determine whether there exists an issue of fact as to whether this new weekly publication competes in any relevant market with plaintiff, thus raising a possible claim of attempted monopoli-

zation under a leveraging theory. Plaintiff is, of course, free to pursue this issue in its lawsuit against News America. The Court notes in this connection, however, that in order to make out a successful leveraging claim, either under an attempt to monopolize theory or a distinct leveraging claim (if such a claim is available in this Circuit), a plaintiff must demonstrate both monopoly power in the first market, and a refusal to "sell a rival the *monopolized goods or services he needs to compete in the second market.*" *Berkey Photo, Inc. v. Kodak Co.*, 603 F.2d at 284 (emphasis supplied). Therefore, plaintiff would be required to come forward with some evidence suggesting that News America monopolizes the service claimed by plaintiff to be essential for it to compete in the market.

essential facilities theory must fail. In order to make out a claim under the essential facilities doctrine, a plaintiff must demonstrate "a *competitor's* inability practically or reasonably to duplicate the essential facility," and "the denial of the use of the facility *to a competitor*." *MCI Communications Corp. v. American Tel. & Tel. Co.,* *supra,* 708 F.2d at 1132–33 (cited in *Twin Laboratories, Inc. v. Weider Health & Fitness, supra,* 900 F.2d at 568–69) (emphasis added). Because plaintiff has not raised a factual issue as to whether the Digest denied its services "to a competitor," any claim based upon the denial of an essential facility must be dismissed.

Even if plaintiff had raised an issue as to whether it competes in the same market with the Digest, the Court would still find based upon the uncontroverted evidence submitted in connection with the instant motion that the advertising pages of the Digest cannot be considered an essential facility in the market for soap opera publications. In the first place, this is simply not a case in which the Digest is "effectively the only [facility] in town." *See Lorain Journal Co. v. United States, supra,* 342 U.S. 143, 72 S.Ct. 181; *Home Placement Service, Inc. v. Providence Journal Co.,* 682 F.2d 274 (1st Cir.1982), *cert. denied,* 460 U.S. 1028, 103 S.Ct. 1279, 75 L.Ed.2d 500 (1983). There are certainly a variety of advertising methods which could be used to reach a particular class of persons, and plaintiff has suggested no structural peculiarity of defendant which makes it a qualitatively different mode of advertisement than, for example, other magazines. *See, e.g., Home Placement Service, Inc. v. Providence Journal Co., supra,* 682 F.2d at 280 (other types of advertising shown

not to be reasonable substitutes for daily newspaper rental advertising).

 In addition, there is substantial uncontradicted evidence in the record that several smaller rivals exist in the market which do not advertise in the Digest.[16] Plaintiff's only response to this evidence is that a *newsletter* cannot promote itself by the same methods as other types of publications. However plaintiff has not addressed the evidence presented by defendant that other soap opera newsletters exist which apparently survive without advertising in the Digest.

In sum, plaintiff has not met its burden on this motion of coming forward with evidence sufficient to create a material factual dispute upon an issue on which it has the ultimate burden of proof at trial. Even assuming that defendant is a monopolist in its product market, unless plaintiff and defendant are in competition with one another, defendant has no duty to deal with plaintiff. *Official Airline Guides, Inc. v. F.T.C.,* 630 F.2d 920, 925–28 (2d Cir.1980) (monopolist publisher of airline flight schedules had no duty to deal on nondiscriminatory basis with various classes of air carriers because it did not compete with them in any market), *cert. denied,* 450 U.S. 917, 101 S.Ct. 1362, 67 L.Ed.2d 343 (1981). *See also United States v. Colgate & Co.,* 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919). Accordingly, summary judgment is granted in favor of defendant on plaintiff's claims under § 2 of the Sherman Act.[17]

III. *The Contract Claim.*

 In addition to its federal claims, plaintiff asserts that defendant by refusing

---

**16.** Stein points out that many of these competitor publications either do not accept advertising, or are published less frequently than the Digest. These facts, while perhaps relevant to the question whether advertising in the Digest is essential to the plaintiff, are not at all relevant to the question whether advertising in the Digest is essential to effective competition in the market. As often stated but particularly pertinent here, the antitrust laws protect competition, not competitors. *Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 344, 82 S.Ct. 1502, 1521, 1534, 8 L.Ed.2d 510 (1962). Simply because a particular plaintiff with peculiar advertising needs decides that it cannot remain profitable without advertising in a certain publication, that publication does not automatically rise to the level of an "essential facility" in the general market unless some substantial number of market entrants or competitors would also be foreclosed.

**17.** Because it finds that plaintiff has failed to raise a factual issue on any of its federal claims, the Court does not address defendant's argument that its refusal to deal is privileged under the first amendment.

to run SONOW's ads breached an alleged contract between the parties. In light of the dismissal of the federal claims upon which plaintiff bases jurisdiction in federal court, discretionary dismissal of the pendant state claim is appropriate. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). No prejudice will accrue to plaintiff by such dismissal as New York Civil Practice Law and Rules § 205(a) allows plaintiff to recommence any action in state court within six months after it is dismissed by a federal court on jurisdictional grounds, if it was timely commenced in the first instance. *See Dunton v. County of Suffolk,* 729 F.2d 903, 911 n. 8 (2d Cir.), *amended on other grounds,* 748 F.2d 69 (2d Cir.1984). Therefore, the pendant state claim should be dismissed pursuant to Rule 12(b)(1), Fed.R. Civ.P., for lack of subject matter jurisdiction.

### CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment dismissing plaintiff's antitrust claims is granted, and the remaining state claim is dismissed for lack of jurisdiction. The preliminary injunction is hereby vacated. The parties are directed to attempt to reach an agreement with respect to the disposition of the funds contained in the escrow account, and if they are not able to agree, to submit proposed counter-orders to the Court on or before June 15, 1990.

It is so ordered.